IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
(Charlotte Division)

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 7 |
| **JTR1, LLC f/d/b/a JTR, LLC** | ) | |
| | ) | Case No. 20-30141 |
| Debtor. | ) | |
| | ) | |
| **A. Burton Shuford, Trustee of the** | ) | |
| **Bankruptcy Estate of JTR1, LLC** | ) | |
| **f/d/b/a JTR, LLC** | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | Adv. Proc. No. 22-_____ |
| | ) | |
| **BJS Insurance, LLC,** | ) | |
| **and JJM, LLC** | ) | |
| Defendants | ) | |
| | ) | |

## COMPLAINT

Now comes A. Burton Shuford (the "Plaintiff") as the Trustee for the Bankruptcy Estate of JTR1, LLC, a Delaware limited liability company, f/d/b/a JTR, LLC, and shows the Court as follows:

### Parties, Jurisdiction, and Venue

1. The Plaintiff is the duly appointed, acting, and qualified Chapter 7 Trustee for the Bankruptcy Estate of the Debtor.

2. JTR1, LLC, a Delaware limited liability company, f/d/b/a JTR, LLC (the "Debtor") is the debtor in the bankruptcy case bearing Case Number 20-30141 (the "Bankruptcy Case"), filed on February 6, 2020 (the "Petition Date"), and pending in the Bankruptcy Court for the Western District of North Carolina (the "Court").

1

3.      The Debtor was owned in equal shares by JMC Financial Holdings, LLC ("JMC"),

TMC Financial, LLC ("TMC"), and RJC Financial, Inc. ("RJC").

4.      In turn, JMC was solely owned by Jeffrey Covelli, TMC was solely owned by Tom

Covelli, and RJC was solely owned by Richard Covelli.

5.      Jeffrey Covelli and Tom Covelli are the sons of Richard and Susan Covelli.

6.      The Court has jurisdiction in this matter by virtue of 28 U.S.C. §1334 and §157,

and the general order of reference for this judicial district.

7.      This is a core proceeding as defined in 28 U.S.C. §157(b)(2).

8.      Venue of this action is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

9.      The Plaintiff commences this action pursuant to Rule 7001 of the Federal Rules of

Bankruptcy Procedure.

10.     Defendant BJS Insurance, LLC ("BJS") is a Maryland limited liability company.

11.     Barry J. Steinfelder ("Steinfelder") is the resident agent of BJS and, on information

and belief, is the sole member of BJS.

12.     Defendant JJM, LLC is a Maryland limited liability company ("JJM" and together

with BJS, "Defendants"). On information and belief, Steinfelder is the manager of JJM.

13.     Steinfelder and Defendants are insiders of the Debtor as such term is defined under

11 U.S.C. § 101(31) and 28 U.S.C. § 3301(5).

**Facts**

*PBGC as Unsecured Claimant in Bankruptcy Case*

14.     The Pension Benefit Guaranty Corporation (the "PBGC") is an unsecured creditor

in the Debtor's bankruptcy case.

2

15.     The PBGC is a wholly-owned United States government corporation and an agency of the United States of America.

16.     The PBGC claim was filed in the Debtor's bankruptcy case [POC No. 1] and is incorporated herein by reference. (the "PBGC Claim").

17.     Pursuant to the terms of a settlement agreement approved by the Bankruptcy Court on May 12, 2021, the PBGC holds an allowed unsecured claim in the Debtor's bankruptcy case in the amount of $6,645,541.00.

18.     The actions underlying the PBGC claim against the Debtor commenced no later than September 2014.

### *Relationship between Steinfelder and the Covellis*

19.     Steinfelder and Richard Covelli have been business associates and friends for approximately 20 years.

20.     Steinfelder and Richard Covelli sometimes speak as often as two to three times per day.

21.     Steinfelder and the Covellis have a history of business and personal transactions.

22.     The parties entered into numerous transactions in advance of this bankruptcy filing and the related bankruptcy filings of Richard Covelli (WDNC Bankruptcy Case No. 20-30143) (the "Covelli Bankruptcy") and C2 Advisors, LLC (WDNC Bankruptcy Case No. 20-30142) (the "C2 Advisors Bankruptcy").

### *Personal Property Transfers*

23.     Cole Hayes, Trustee of the Bankruptcy Estate of Richard J. Covelli (WDNC Bankruptcy Case No. 20-30143) has filed an adversary proceeding against Steinfelder (the "Covelli Complaint").

24.     As more fully alleged in the Covelli Complaint, prior to the Covelli Bankruptcy, Steinfelder and Richard Covelli orchestrated purported purchases (the "Personal Property Purchases") of (i) around 900 bottles of wine (the "Wine"), (ii) a Bentley automobile (the "Bentley"), and (iii) a pontoon boat (the "Boat") owned by Richard Covelli.

25.     In December 2019, Steinfelder paid, through his entity JJM, $425,000 to Rich Covelli.

26.     Richard Covelli has asserted that the funds he received from JJM were in consideration for the Personal Property Transfers and a loan to the Debtor in the amount of $297,500.00, evidenced by a note dated December 31, 2019 (the "Personal Property Note").

27.     The sale price of the Personal Property Transfers was $177,500.00.  That amount, plus the value of the Personal Property Note equals $475,000.00.  However, the Debtor only received $425,000.00 from JJM.

28.     Per the allegations of the Covelli Complaint, the amount delivered as consideration for the Personal Property Purchases was below the market value of the property.

29.     Further, following the Personal Property Purchases, Richard Covelli continued in possession of all but two cases of the Wine.  Richard Covelli also continued to control, maintain and use both the Bentley and the Boat.

*Joint Involvement in Businesses*

30.     In 2018, Seperium, LLC, a North Carolina limited liability company ("Seperium") was formed.

31.     Seperium is now known as JTB Marketing, LLC.

32.     The original owners of Seperium were JMC Financial Holdings, TMC Financial, LLC, and RJC Financial, Inc., which were the same owners of the Debtor.

4

33.     The purpose of Seperium was to "rebrand" in light of the litigation pending against the Debtor and C2 Advisors.

34.     In 2019 RJC Financial, Inc. sold its membership interest to either Steinfelder or an entity controlled by Steinfelder.

### PBGC as Unsecured Claimant in Bankruptcy Case

35.     The Pension Benefit Guaranty Corporation (the "PBGC") is an unsecured creditor in the Debtor's bankruptcy case.

36.     The PBGC is a wholly-owned United States government corporation and an agency of the United States of America.

37.     The PBGC claim was filed in the Debtor's bankruptcy case [POC No. 1] and is incorporated herein by reference. (the "PBGC Claim").

38.     Pursuant to the terms of a settlement agreement approved by the Bankruptcy Court on May 12, 2021, the PBGC holds an allowed unsecured claim in the Debtor's bankruptcy case in the amount of $6,645,541.00.

39.     The actions underlying the PBGC claim against the Debtor commenced no later than September 2014.

### The Debtor's Involvement with the Freedom Communications Pension Plan

40.     The genesis of the Debtor's bankruptcy filing begins with its involvement in investments made by the defined benefit pension plan of Freedom Communications, Inc. ("Freedom"). The Debtor's assistance related to this pension plan ultimately resulted in its being named as a defendant in two lawsuits pending in the United States District Court and Bankruptcy Court of the Central District of California:

5

    a.   *Official Committee of Unsecured Creditors v. Kushner, et al.*, Adv. No. 8:17-ap-01012 (Bankr. C.D. Cal.) (the "Freedom Committee Action"). A copy of the complaint in the Freedom Committee Action is attached as Exhibit A to Proof of Claim No. 1 filed in the Debtor's case.

    b.   *PBGC v. Spitz, et al.*, Case No. 8:19-cv-00299 (the "District Court Action" and together with the Freedom Committee Action, the "PBGC Lawsuits"). A copy of the complaint in the District Court Action is attached as Exhibit B to Proof of Claim No. 1 filed in the Debtor's case.

41.    In the PBGC Lawsuits, the plaintiffs assert that the Debtor is liable for damages exceeding $110 million.

42.    The allegations that follow give a brief overview of the claims against the Debtor in the PBGC Lawsuits.

43.    In 2012, Aaron Kushner ("Kushner") and Eric Spitz ("Spitz") acquired Freedom, a media and newspaper company based in California.  At the time of the purchase, Freedom sponsored a single-employer defined benefit pension plan covered by the pension plan termination insurance program established pursuant to 29 U.S.C. §§ 1301 – 1461 ("ERISA").  Freedom's pension plan (the "Freedom Plan") was underfunded at the time of the purchase such that the provisions of ERISA required Freedom to make funding contributions to the Freedom Plan.

44.    Richard Covelli, both personally and through the Debtor and certain other  entities related to the Debtor and their retained professionals, sought to assist Kushner and Spitz decrease the funding contribution requirement by boosting the book value of the Freedom Plan's assets.

45.    In early 2014, on the advice and counsel of Richard Covelli, the Debtor, and certain other entities related to the Debtor and their retained professionals, the Freedom Plan transferred

$9,400,025.00 into a money market account.  From that account, Richard Covelli, the Debtor, and certain other related entities and retained professionals facilitated the Freedom Plan's purchase of over $7 million in policies insuring the lives of Freedom Plan participants.  Based on the accounting methodology used in the transaction, the Freedom Plan's investment in these life insurance policies greatly increased the perceived value of the Freedom Plan's assets.  The remaining funds in the money market account were used to pay the fees and commissions of Richard Covelli, certain of his related entities, and others.

46.     By mid-2014, it was apparent to Kushner and Spitz that (i) the policies the Freedom Plan purchased could not be valued using the methodology promoted by Richard Covelli, (ii) the Freedom Plan remained grossly underfunded, and (iii) and the purchase of the policies may have violated ERISA.

47.     In September 2014, after previously failing to boost the value of the Freedom Plan's assets, Richard Covelli, the Debtor and certain other related entities, and their retained professionals again sought to assist Kushner and Spitz with the Freedom Plan's funding shortfall.

48.     On the advice and counsel of Richard Covelli the Debtor and certain other related entities, and their retained professionals, Kushner and Spitz caused the Freedom Plan to invest in life settlement agreements whereby the Freedom Plan would enter into loan agreements with unrelated owners of life insurance policies.

49.     The Freedom Plan, through a subsidiary, LT Funding, LLC ("LT Funding"), would loan the funds required to make the ongoing life insurance premium payments with the expectation that the Freedom Plan would receive a percentage of the death benefits on the passing of the insured and with the immediate plan to assign a book value to the loans, which would decrease, or eliminate, the funding deficit of the Freedom Plan (the "LT Funding Transaction").

50.     For illustrative purposes, as of December 31, 2014, the Freedom Plan had paid $9.3 million in connection with the LT Funding Transaction.  At that time, an actuary recommended by Richard Covelli valued the purchased contracts for the Freedom Plan at $63.2 million dollars.

51.     Freedom Plan (a) invested approximately $32 million into LT Funding, (b) LT Funding entered into contractual obligations to loan millions of dollars to over 80 irrevocable life insurance trusts (the "LT Funding Obligations" and the "ILITs", respectively) for the purpose of funding premiums on life insurance policies owned by the ILITs, and (c) paid unreasonable, above-market, and other compensation to Richard Covelli and the other defendants named in the PBGC Lawsuits, including the Debtor.

52.     Before the LT Funding Transaction, the Debtor had entered into loan agreements with several of the ILITs (the "JTR Obligations").  By the time of the LT Funding Transaction, the Debtor could no longer afford to satisfy the JTR Obligations.

53.     On or about December 31, 2014, the Freedom Plan effectuated the LT Funding Transaction, pursuant to which JTR was replaced by LT Funding as the obligor with respect to the JTR Obligations, and, in exchange for a significant payment (the "JTR Subordination Fee"), to subordinate the JTR Obligations to the LT Funding Obligations.

54.     The parties entered into a second purchase and subordination arrangement in December 2015, which resulted in additional payments to Richard Covelli and his associated entities, including the Debtor.

55.     Richard Covelli and the Debtor benefited from the LT Funding Transaction. The transaction relieved the Debtor from the JTR Obligations.   The Debtor received the JTR Subordination Fee. The Debtor and Richard Covelli also received significant additional payments in connection with the LT Funding Transaction.

4889-8550-4267, v. 4

56.     The valuations underlying the LT Funding Transaction were significantly inaccurate. Ultimately, the LT Funding Transaction caused the Freedom Plan to lose virtually all of its cash outlay and remain grossly underfunded.

57.     The Debtor and/or the Covelli entities were paid at least $13 million by the Freedom Plan for their role in the Freedom Plan's investment in the life settlement agreements.

58.     Freedom ultimately filed a Chapter 11 bankruptcy in the Central District of California.

59.     An unsecured creditors committee was appointed.  The PBGC is a member of the creditors committee.

60.     The PBGC is a wholly owned United States government corporation and an agency of the United States established to administer and enforce ERISA's defined benefit pension plan termination insurance program.  The PBGC guarantees the payment of certain pension benefits upon the termination of pension plans covered by ERISA.  When an underfunded pension plan terminates, PBGC generally becomes the statutory trustee of the plan and pays all guaranteed retirement benefits, up to statutory limits.

61.     The PBGC is now the statutory trustee of the Freedom Plan.

*Litigation with the Unsecured Creditors Committee and PBGC*

62.     In January 2017, the unsecured creditors committee filed the Freedom Committee Action.  In the Freedom Committee Action, among other claims, the Debtor is accused of aiding and abetting breach of fiduciary duty for its role in the Freedom Plan's failed attempts to boost the book value of its assets.  In addition to the Debtor, Richard Covelli, C&C Marketing LLC, C2 Advisors, LLC, Spitz, Kushner, Traci M. Christian, Larry P. Chinn, Etaros Actuarial Services, LLC, and Financial Institution Consulting Corporation are named as defendants.

4889-8550-4267, v. 4

63.    In February 2019, the PBGC filed the District Court Action, in which the PBGC asserts claims against the Debtor for participating in prohibited transactions under ERISA.  In addition to the Debtor, the PBGC also named Spitz, Kushner, Richard Covelli, Traci M. Christian, C&C Marketing LLC, C2 Advisors, LLC, and Etaros Actuarial Services, LLC as defendants in the District Court Action.

64.    The District Court Action and the Freedom Plan Action were consolidated the month prior to the Petition Date (the "Consolidated Action").

65.    With the exception of Richard Covelli and his entities (the Debtor, C&C Marketing LLC, and C2 Advisors, LLC), each of the defendants to the Consolidated Action have settled the claims asserted against them:

a.    Kushner and Spitz settled for a total payment of $7,835,000.00.

b.    Traci M. Christian and Etaros Actuarial Services, LLC consented entry of judgment against them for $600,000.00.

c.    Chinn filed his own bankruptcy in the Western District of Tennessee; after his bankruptcy filing, Chinn entered into a settlement agreement requiring the total payment of $400,000.00.

66.    But for the automatic stay imposed by the Debtor's Bankruptcy Case, a trial on the Consolidated Action would have commenced in 2020.

## *Equitable Tolling*

67.    To the extent that the Defendant alleges that any statute of limitations has expired, the Defendant should be estopped from asserting any such defenses, and the Court should equitably toll the applicable limitations period.

4889-8550-4267, v. 4

68.     During his investigation into the Debtor, its financial affairs, its transactions with insiders, and the claims set forth in this Complaint the Trustee has discovered evidence illustrating that the true nature of various transactions and claims were concealed or attempted to be concealed, not disclosed, or which appear to have been mischaracterized to disguise the true nature of the underlying transactions and claims.

69.     Given the intermingling of the Debtor's and the Defendant's business affairs permitting the Defendant to rely on the statute of limitations to defeat the claims asserted by the Plaintiff would be inequitable.

70.     Furthermore, the Trustee has acted diligently in conducting his investigation into the Debtor's financial affairs.

## *Additional Claims*

71.     During this adversary proceeding, Plaintiff may learn of additional facts that give rise to additional claims for relief against the Defendant or third parties.  The Plaintiff intends to pursue all such claims.  Accordingly, in the event additional transactions or transfers are identified through discovery in this case, the Plaintiff expressly reserves the right to amend this Complaint to add additional claims or to seek to avoid and recover other transfers of property of the Debtor to the Defendant.

## *Background to Transfers to Defendant*

72.     As context for the transfers described herein, the Debtor was in the business of purchasing and holding debt, which arose from the financing of insurance premiums.

73.     In a typical transaction:

   a.  A high net worth individual (an "Insured") would apply for and obtain a large whole life insurance policy on his or her life (the "Policy");

11

b.   The broker who initiated the Policy would receive a commission thereon;

c.   The Insured would establish an ILIT (an individual life insurance trust), which would (i) hold the Policy, (ii) make the premium payments on the Policy, and (iii) when the insured died and the policy benefits were paid, distribute the policy benefits;

d.   The trustees for the ILITs received compensation for holding the role;

e.   As the Policy would usually be the sole asset of the ILIT, the ILIT would have no funds with which to make the premium payments on the Policy;

f.   In order to make the premium payments, the ILIT would borrow funds from either the Insured (the settlor of the ILIT) or from a third party (a "Lender");

g.   The promissory notes evidencing the loans were often called premium finance notes (in whatever form such note may be issued, such documents shall be referred to herein as a "PFN" or "PFNs");

h.   Interest and fees would accrue on the PFNs;

i.   The PFNs were secured by the Policy;

j.   The principal amounts of the PFNs would be insufficient to pay all premium amounts, which would eventually come due;

k.   It was not uncommon for a ILIT to default in payment of the PFNs;

l.   If a default occurred, the Lender, or its transferee, would claim the payment rights to the underlying Policy;

m.   If the Lender, or its transferee, if the Lender failed to make ongoing premium payments, the Policy to be terminated without the payment of any benefits;

n.   An originating Lender would frequently sell a PFN, or inventories of PFNs, to a third party.

### *The Blair Matter*

74.    From time to time the Debtor would purchase and sell PFNs.

75.    One such PFN (the "Blair PRN"), which the Debtor held, arose out of a premium finance loan to an ILIT established by a Mr. Blair (the "Blair ILIT"), which held an insurance policy that insured the life of Mr. Blair (the "Blair Policy").

76.    The debt owed by the Blair ILIT to the Debtor was in excess of $1,100,000.

77.    On information and belief, JJM also made loans to the Blair ILIT for the purpose of financing the premiums of the Blair Policy in an amount in excess of $1,000,000.

78.    The JJM loan may have been junior in priority to the JTR loan.

79.    On information and belief, in 2016 the Blair ILIT sold the Blair Policy to a third party.

80.    On information and belief, in connection with the closing of the sale of the Blair Policy, the Blair ILIT settled its obligations to JTR and JJM by agreeing to pay a total of $2,000,000.00 (jointly, the "Blair Settlement Proceeds").

81.    Although the Blair Settlement Proceeds were paid to settle separate obligations of JJM and JTR, they were treated by the Defendants and the Debtor as one common fund in which the Defendant entities and JTR each held a one-half interest.

82.    On information and belief, the full Blair Settlement Proceeds were paid to Defendant BJS and disbursed by Defendant BJS on or about January 11, 2017 as set out below.

13

83.    A portion of the Blair Settlement Proceeds was distributed in connection with a separate transaction, which will be referred to herein as the "Bode Transaction".  The following is a brief description of the Bode Transaction:

  a.  In or around October 2016, RJC purchased a group of PRNs from Bode Capital, LLC ("Bode");

  b.  Upon information and belief, the PRNs to be purchased from Bode consisted of thirteen obligations related to the finance of insurance premiums with a total loan amount of $4,959,685;

  c.  Upon information and belief, the purchase price of the PRNs from Bode was $500,000;

  d.  On or about October 31, 2016, Defendant BJS wired $450,000 to RJC for payment toward the purchase price of the Bode Transaction;

  e.  Upon information and belief, Defendant BJS wired an additional $50,000 directly to Bode to satisfy the remaining amount due on the Bode Transaction.

  f.  Upon information and belief, the Bode PRNs were ultimately transferred from Bode to Defendant BJS pursuant to a letter agreement dated October 20, 2016 between Bode and Defendant BJS.

84.    Upon information and belief, Defendant BJS retained the following amounts from the Blair Settlement Funds:

  a.  $500,000 as a reimbursement for the $450,000 paid to RJC in the Bode Capital Transaction (though the original amount "loaned" by BJS to RJC was only $450,000 *and* the beneficiary of the "loan" was RJC, not the Debtor) (the $500,000 described herein shall be referred to as the "Bode Transfer") and

b.   $87,710 to defray the costs of Defendant BJS (the "BJS Blair Costs Transfer").

85.    Upon information and belief, BJS sent $15,000 of the Blair Settlement Proceeds to Mike Smith, Trustee of the Blair ILIT.

86.    Upon information and belief, the remainder of the Blair Settlement Proceeds, in the net amount of $1,400,290 were equally divided between Defendant BJS and the Debtor, such that the Debtor was to receive $700,145 and the Defendant was to receive a like amount.  (The $700,145 retained by BJS shall be referred to herein as the "BJS Blair Transfer" and together with the Bode Transfer, the BJS Blair Costs Transfer, the "Blair Transfers").

87.    Upon information and belief, the Debtor held a primary payment right in the Blair Settlement Funds.

88.    On information and belief, the payment to JTR was less than the full outstanding principal and interest owed to JTR by the Blair ILIT.

89.    The transfer of any portion of the Blair Settlement Funds prior to the Debtor receiving its full payment due on the Blair PRN constitutes a transfer of an interest of the Debtor in property.

90.    Upon information and belief, the Debtor owed no debt to any of the recipients of the Blair Transfers.

91.    Upon information and belief, none of the Blair Transfers were made pursuant to a contract.

92.    Upon information and belief, even though the Debtor transferred value in connection with the Bode Transaction, the Debtor received no interest in the Bode Notes.

93.    Upon information and belief, the Debtor did not receive reasonably equivalent value in exchange for any of the Blair Transfers.

15

94.    Defendants BJS and JJM benefited from the Blair Transfers.

### *The Cooperstone Matter*

95.    On information and belief, the Debtor was the holder of a debt instrument, which arose out of a premium finance loan to an ILIT established by a Mr. Cooperstone (the "Cooperstone ILIT").  The Cooperstone ILIT held an insurance policy that insured the life of  Mr. Cooperstone (the "Cooperstone Policy").

96.    On information and belief, Mr. Cooperstone died and the death benefit was paid to the Cooperstone ILIT in 2016.

97.    On information and belief, the Cooperstone ILIT satisfied its obligations to the Debtor by paying $880,000 to the Debtor (the "Cooperstone Note Proceeds").

98.    On information and belief, the Cooperstone Note Proceeds were paid to the Debtor and accounted for by the Debtor as set out below.

99.    Upon information and belief, after receipt of the Cooperstone Note Proceeds, prior to distribution of the proceeds to BJS and the Debtor, the following were deducted:

   a.   $100,000 for Gary Brecka, who is believed to be an insurance broker (the reason for the distribution to Mr. Brecka is unknown)

   b.   $131,292.00 for Locke Lord legal fees;

   c.   $25,000.00 for a Locke Lord retainer;

   d.   $10,000.00 for Lewis & Ellis for actuarial fees for PBGC work; and

   e.   $24,750.00 for Etaros for actuarial services for PBGC work.

100.    Upon information and belief, Defendant BJS neither shared ownership of the Cooperstone PRN nor held its own security interest in connection with the Cooperstone Policy.

16

101.    Notwithstanding the foregoing, on information and belief, the remainder of the Cooperstone Note Proceeds, in the amount of $588,958, were equally divided between Defendant BJS and the Debtor, such that the Debtor was to receive $294,479 and Defendant BJS was to receive a like amount. (The $294,479 transferred to BJS shall be referred to herein as the "Cooperstone Transfer")

102.    The Cooperstone Note Proceeds and the Blair Settlement Proceeds were disbursed at the same time.  The Defendant held the Blair Settlement Proceeds and the Debtor held the Cooperstone Note Proceeds.  In settling these proceeds between the Defendant and the Debtor, the amounts owed to each were netted out.

103.    The Debtor was to pay $294,479 to the Defendant from the Cooperstone Note Proceeds and the Defendant was to pay $700,145 to the Debtor from the Blair Settlement Proceeds.

104.    To avoid swapping payments, the Defendant reduced its payment to the Debtor by $294,479 and only disbursed $405,666 to the Debtor from the Blair Settlement Proceeds.

105.    The Debtor retained the $294,479 that was to be paid to BJS.

106.    The Cooperstone Transfer constitutes a transfer of an interest of the Debtor in property.

107.    Upon information and belief, the Debtor owed no debt to any of the Defendants at the time the Cooperstone Transfer was made.

108.    Upon information and belief, the Cooperstone Transfer was not made pursuant to a contract.

109.    Upon information and belief, the Debtor did not receive reasonably equivalent value in exchange for the Cooperstone Transfer.

4889-8550-4267, v. 4

*The Becker Matter*

110.    On information and belief, the Debtor was the holder of a debt instrument, which arose out of a premium finance loan to an ILIT established by a Mr. Becker (the "Becker ILIT"). The Becker ILIT held a Policy which insured the life of Mr. Becker (the "Becker Policy").

111.    On information and belief, Mr. Becker died and the death benefit was paid to the Becker ILIT in or around 2017.

112.    On information and belief, the obligation of the Becker ILIT to the Debtor was settled by the payment of $1,110,461.00 to the Debtor (the "Becker Settlement Proceeds").

113.    On information and belief, the Becker ILIT was also indebted to Defendant BJS and the debt of the Becker ILIT to BJS was settled by the payment of $21,350.00 to the Defendant.

114.    On information and belief, Defendant BJS and the Debtor agreed to treat the two settlement amounts set out above as one settlement in the total sum of $1,131,811.00 (the "Becker Settlement Proceeds").

115.    On information and belief, after receipt of the Debtor's portion of the Becker Settlement Proceeds, the Debtor and the Defendant agreed that the following expenses could be deducted from the Becker Settlement Proceeds prior to the Becker Settlement Proceeds being divided by the Defendant and the Debtor:

      a.     $242,208 for attorney fees owed to Locke Lord; and,

      b.     $98,055 to reimburse Defendant BJS for legal fees incurred.

116.    On information and belief, after the above were deducted from the Becker Settlement Proceeds, the net settlement was in the amount of $791,548.00.

4889-8550-4267, v. 4

117.    It appears that the Debtor and Defendant BJS equally divided the net Becker Settlement Proceeds such that the Debtor was to receive $395,774.00 and BJS was to receive a like amount.

118.    Upon information and belief, BJS had no right to receive a portion of the Becker Settlement Proceeds beyond the $21,350.00 due on the PRN BJS held from the Becker ILIT.

119.    The Debtor held $1,110,461 of the Becker Settlement Proceeds and BJS held $21,350 of the Becker Settlement Proceeds.  In settling these proceeds between the Defendant and the Debtor, the amounts owed to each were netted out as set out below.

    a.    Debtor transferred $472,479 (the "Becker Transfer") to BJS, which represented BJS's one-half of the net settlement proceeds ($395,774) plus the legal fee reimbursement ($98,055) less the portion of the settlement funds that were wired directly to the Defendant ($21,3650);

    b.    $242,208 was deducted for fees paid to Lock Lorde; and

    c.    Of the $1,110,461 originally paid to the Debtor from the Becker Settlement Proceeds, the Debtor only retained $395,774.00.

120.    The Becker Transfer constitutes a transfer of an interest of the Debtor in property.

121.    Upon information and belief, at the time the Becker Transfer occurred, the Debtor owed no debt to BJS.

122.    Upon information and belief, the Becker Transfer was not made pursuant to a contract.

123.    Upon information and belief, the Debtor did not receive reasonably equivalent value in exchange for the Becker Transfer.

4889-8550-4267, v. 4

124.     Upon information and belief, Defendants BJS and Steinfelder benefited from the
Becker Transfer.

### *Transfer of $545,500 to BJS*

125.     On or about December 30, 2015, the Debtor sent a wire transfer to Defendant BJS
in the amount of $545,500.00 (the "$545,500 Transfer").

126.     The $545,500 Transfer constitutes a transfer of an interest of the Debtor in property.

127.     On information and belief, the $545,500 Transfer was made from funds received
through the LT Funding Transaction and as part of the Freedom Communications schemes.

128.     On information and belief, the Debtor received no value from BJS on account of
the $545,500 Transfer to the Defendant.

129.     Upon information and belief, at the time the $545,500 Transfer occurred, the Debtor
owed no debt to BJS.

130.     Upon information and belief, the $545,500 Transfer was not made pursuant to a
contract.

131.     Upon information and belief, the Debtor did not receive reasonably equivalent
value in exchange for the $545,500 Transfer.

### *Transfer of $472,479 to BJS*

132.     On or about November 13, 2017, the Debtor sent a wire transfer in the amount of
$472,479 to Defendant BJS (the "$472,479 Transfer").

133.     On information and belief, the Debtor received no value from BJS on account of
the $472,479 Transfer to BJS.

134.     The $472,479 Transfer constitutes a transfer of an interest of the Debtor in property.

4889-8550-4267, v. 4

135.     Upon information and belief, at the time the $472,479 Transfer occurred, the Debtor owed no debt to BJS.

136.     Upon information and belief, the $472,479 Transfer was not made pursuant to a contract.

137.     Upon information and belief, the Debtor did not receive reasonably equivalent value in exchange for the $472,479 Transfer.

### *Transfer of $76,081.96 to BJS-LLC*

138.     On or about April 5, 2019, the Debtor delivered $76,081.96 to Defendant BJS (the "$76,081.96 Transfer").

139.     On information and belief, the Debtor received no value from BJS on account of the $76,081.96 Transfer to BJS.

140.     The $76,081.96 Transfer constitutes a transfer of an interest of the Debtor in property.

141.     Upon information and belief, at the time the $76,081.96 Transfer occurred, the Debtor owed no debt to BJS.

142.     Upon information and belief, the $76,081.96 Transfer was not made pursuant to a contract.

143.     Upon information and belief, the Debtor did not receive reasonably equivalent value in exchange for the $76,081.96 Transfer.

### *Transfer of Beneficiary to Life Insurance Policy*

144.     On March 15, 2017, the Debtor sent a wire transfer to Zurich American Life Insurance Company in the amount of $508,480.00 (the "Zurich Transfer").

4889-8550-4267, v. 4

145.    On information and belief, the Zurich Transfer was issued in connection with the issuance of a life insurance policy for Richard Covelli (the "Life Insurance Policy").

146.    On February 6, 2020, the Debtor filed its Schedules in this bankruptcy case [ECF No. 1] (the "Schedules").

147.    As disclosed in the Schedules, a "Zurich Life Insurance Policy" bearing number 217093 existed as of the Petition Date. This is presumed to be the Life Insurance Policy.

148.    In the Schedules, the Debtor disclosed that Defendant BJS holds an interest in the death benefits of the Life Insurance Policy.

149.    The Zurich Transfer is the transfer of an interest of the Debtor in property.

150.    On information and belief, the Debtor received no value from BJS on account of the Zurich Transfer or in connection with the Life Insurance Policy.

*Transfer of Inventory to BJS*

151.    On or about April 5, 2019 pursuant to a Note Purchase and Sale Agreement of even date, the Debtor transferred all of its inventory, which included a number of PRNs (the "Inventory") to Defendant BJS for the sole consideration of $357,000.00 (the "Inventory Transfer").

152.    In valuing the Inventory, the Debtor made no adjustments for interest or additional amounts collectable under the PRNs.

153.    The Debtor failed to conduct an appraisal or other valuation of the Inventory prior to the transfer.

154.    The Debtor did not market the Inventory or offer it to anyone for purchase other than Steinfelder.

4889-8550-4267, v. 4

155.    On information and belief, the purchase price of the Inventory was significantly below the actual value of the Inventory.

156.    On information and belief, shortly following the Inventory Transfer, at least one of the PRNs in the Inventory, connected to a Mrs. Gomprecht, issued a benefits payout, pursuant to which BJS received a multiple of the $357,000 purchase price.

157.    The Inventory Transfer constitutes a transfer of the Debtor in property.

158.    Upon information and belief, the Debtor did not receive reasonably equivalent value in exchange for the Inventory.

*Summary*

159.    To illustrate the transfers described above, the Debtor made each of the transfers listed in the chart below, to the party, in the amount, and on the date set forth (each a "Transfer" and together the "Transfers"):

| Date | Value | Transferee | Name |
|---|---|---|---|
| 12/30/2015 | $545,500 | BJS | $545,500 Transfer |
| 10/31/2016 | $500,000 | BJS f/b/o JJM | Bode Transfer |
| 10/31/2016 | $87,710 | BJS f/b/o JJM | BJS Blaire Costs Transfer |
| 10/31/2016 | $700,145 | BJS f/b/o JJM | BJS Blaire Transfer |
| 10/31/2016 | $294,479 | BJS | Cooperstone Transfer |
| 2017 (Exact date unknown) | $472,479 | BJS | Becker Transfer |
| 3/15/2017 | $508,480 | BJS | Zurich Transfer |
| 11/13/2017 | $472,479 | BJS | $472,479 Transfer |
| 4/5/2019 | $76,081.96 | BJS | $76,081.96 Transfer |
| 4/5/2019 | Unknown | BJS | Inventory Transfer |

**Total of known transfer values: $3,772,354.00**

160.    Each Transfer constituted the transfer of an interest of the Debtor in property.

161.    On information and belief, at the time each Transfer occurred, the Debtor did not owe debts to either of the Defendants.

162.   On information and belief, the Debtor did not receive reasonably equivalent value in exchange for any of the Transfers.

163.   On information and belief, none of the Transfers was made pursuant to a contract or negotiated payment agreement.

164.   Debtor was insolvent at the time of each Transfer.

165.   At the time each Transfer occurred, the PBGC was a "creditor" (as the term "creditor" is defined in 28 U.S.C. § 3301(4)) of the Debtor.

166.   Trustee brings these claims within the period afforded by the statute of limitations.

**COUNT I – Avoidance of All Transfers**
**11 U.S.C. § 544(b), 28 U.S.C. §§ 3304(a)(1) and 3306**

167.   Plaintiff incorporates the allegations set forth in the paragraphs above.

168.   Each of the Transfers is avoidable on the grounds set forth in 11 U.S.C. § 544(b), 28 U.S.C. §§ 3304(a)(1) and 3306.

169.   Each of the Transfers was made voluntarily by the Debtor within six years before the Petition Date.

170.   The Debtor was insolvent at the time each of the Transfers occurred.

171.   Upon information and belief, the Debtor did not receive reasonably equivalent value in exchange for any of the Transfers.

172.   Upon information and belief, none of the Transfers were made as payment for an antecedent debt.

173.   None of the Transfers were a "charitable contribution" under the meaning of 11 U.S.C. § 544(b)(2).

174.   None of the Transfers resulted from the termination of a lease upon default by the Debtor.

24

175.    None of the Transfers resulted from enforcement of a security interest in compliance with Article 9 of the Uniform Commercial Code or its equivalent.

176.    Trustee is entitled to judgment avoiding each Transfer under the provisions of 11 U.S.C. § 544 and 28 U.S.C. §§ 3304(a)(1) and 3306 in the full value of each of the Transfers.

## **COUNT II – Avoidance of All Transfers, in the alternative to Count I, 11 U.S.C. § 544(b), 28 U.S.C. §§ 3304(b)(1)(A) and 3306**

177.    Plaintiff incorporates the allegations set forth in the paragraphs above.

178.    Each of the Transfers is avoidable on the grounds set forth in 11 U.S.C. § 544(b), 28 U.S.C. §§ 3304(b)(1)(A) and 3306.

179.    Each of the Transfers was made voluntarily by the Debtor within six years before the Petition Date.

180.    Each of the Transfers was made by Debtor with actual intent to hinder, delay or defraud entities to which Debtor was indebted.

181.    Each of the Transfers was made to an insider.

182.    At least one of the Transfers was made in connection with an unlawful, fraudulent, and deceptive scheme as more fully described above and in the PBGC Claim.

183.    None of the Transfers was a "charitable contribution" under the meaning of 11 U.S.C. § 544(b)(2).

184.    None of the Transfers resulted from the termination of a lease upon default by the Debtor.

185.    None of the Transfers resulted from the enforcement of a security interest in compliance with Article 9 of the Uniform Commercial Code or its equivalent.

186.    Trustee is entitled to judgment avoiding each of the Transfers under the provisions of 11 U.S.C. § 544 and 28 U.S.C. §§ 3304(b) and 3306 in the full value of each Transfer.

### COUNT III – Avoidance of All Transfers, in the alternative to Counts I-II,
### 11 U.S.C. § 544(b), 28 U.S.C. §§ 3304(b)(1)(B) and 3306

187.    Plaintiff incorporates the allegations set forth in the paragraphs above.

188.    Each of the Transfers is avoidable on the grounds set forth in 11 U.S.C. § 544(b), 28 U.S.C. §§ 3304(b)(1)(B) and 3306.

189.    Each of the Transfers was made voluntarily by the Debtor within six years before the Petition Date.

190.    At the time that each of the Transfers occurred the Debtor was engaged or was about to engage in a business or transaction for which the remaining assets of the Debtor were unreasonably small in relation to the business or transaction or the Debtor intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

191.     The Debtor did not receive reasonably equivalent value in exchange for any of the Transfers.

192.    None of the Transfers were "charitable contribution" under the meaning of 11 U.S.C. § 544(b)(2).

193.    None of the Transfers resulted from termination of a lease upon default by the Debtor.

194.    None of the Transfers resulted from enforcement of a security interest in compliance with Article 9 of the Uniform Commercial Code or its equivalent.

195.    Trustee is entitled to judgment avoiding each Transfer under the provisions of 11 U.S.C. § 544 and 28 U.S.C. §§ 3304(b) and 3306 in the full value of each Transfer.

4889-8550-4267, v. 4

## COUNT IV –
### Avoidance of Certain Transfers, in the alternative to Counts I-III, 11 U.S.C. § 544(b), N.C. Gen Stat. § 39-23.1 et seq. (alleging both constructive fraud and actual fraud, in the alternative)

196.     Plaintiff incorporates the allegations set forth in the paragraphs above.

197.     Each of the Bode Transfer, the BJS Blaire Costs Transfer, the BJS Blaire Transfer, the Cooperstone Transfer, the Becker Transfer, the $472,479 Transfer, the $76,081.96 Transfer, the Zurich Transfer, and the Inventory Transfer (jointly the "Count IV Transfers") is avoidable on the grounds set forth in 11 U.S.C. § 544(b), N.C. Gen Stat. § 39-23.1 et seq.

198.     Each of the Count IV Transfers was made voluntarily by the Debtor within four years before the Petition Date.

199.     At the time each of the Count IV Transfers occurred the Debtor was engaged or was about to engage in a business or transaction for which the remaining assets of the Debtor were unreasonably small in relation to the business or transaction or the Debtor intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

200.     The Debtor did not receive reasonably equivalent value in exchange for any of the Count IV Transfers.

201.     Each of the Count IV Transfers were made by Debtor with actual intent to hinder, delay or defraud entities to which Debtor was indebted.

202.     Each of the Count IV Transfers was made to or for the benefit of an insider.

203.     None of the Count IV Transfers were a "charitable contribution" under the meaning of 11 U.S.C. § 544(b)(2).

204.     None of the Count IV Transfers resulted from termination of a lease upon default by the Debtor.

4889-8550-4267, v. 4

205.    None of the Count IV Transfers resulted from enforcement of a security interest in compliance with Article 9 of the Uniform Commercial Code or its equivalent.

206.    Trustee is entitled to judgment avoiding each of the Count IV Transfers under the provisions of 11 U.S.C. § 544 and N.C. Gen Stat. § 39-23.1 et seq. in the full value of each of the Count IV Transfers.

## COUNT V- Avoidance of Certain Transfers in the alternative to Counts I-IV, 11 U.S.C. § 548 (alleging both constructive fraud and actual fraud, in the alternative)

207.    Plaintiff incorporates the allegations set forth in the paragraphs above.

208.    Each of the $76,081.96 Transfer and the Inventory Transfer (jointly, the "Count V Transfers") is avoidable on the grounds set forth in 11 U.S.C. § 548.

209.    Each of the Count V Transfers was made voluntarily by the Debtor within two years before the Petition Date.

210.    At the time each of the Count V Transfers occurred, the Debtor was engaged or was about to engage in a business or transaction for which the remaining assets of the Debtor were unreasonably small in relation to the business or transaction or the Debtor intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

211.    The Debtor did not receive reasonably equivalent value in exchange for any of the Count V Transfers.

212.    Each of the Count V Transfers was made by Debtor with actual intent to hinder, delay or defraud entities to which Debtor was indebted.

213.    Each of the Count V Transfers was made to an insider.

214.    As to the Inventory Transfer, the transfer resulted in the loss of assets of significant value.

4889-8550-4267, v. 4

215. None of the Count V Transfers were a "charitable contribution" under the meaning of 11 U.S.C. § 548.

216. None of the Count V Transfers resulted from termination of a lease upon default by the Debtor.

217. None of the Count V Transfers resulted from enforcement of a security interest in compliance with Article 9 of the Uniform Commercial Code or its equivalent.

218. Trustee is entitled to judgment avoiding each of the Count V Transfers under the provisions of 11 U.S.C. § 548 up to the full value of each of the Count V Transfers.

**COUNT VI: Recovery of Transfers pursuant to 11 U.S.C. § 550**

219. Plaintiff realleges all prior paragraphs of this complaint and incorporates them as if fully set forth herein.

220. The Transfers are each avoidable pursuant to 11 U.S.C. § 544 and 28 U.S.C. §§ 3304 and 3306.

221. In the event that the Court determines all the Transfers are not avoidable pursuant to 11 U.S.C. § 544 and 28 U.S.C. §§ 3304 and 3306, then, in the alternative, each of the Count IV Transfers are avoidable pursuant to 11 U.S.C. § 544 and N.C. Gen. Stat. 39-21.1 et. seq.

222. In the event the Court determines that neither 11 U.S.C. § 544 and 28 U.S.C. §§ 3304 and 3306 nor 11 U.S.C. § 544 and N.C. Gen. Stat. 39-21.1 et. seq. apply in this case, then each of Count V Transfers are avoidable pursuant to 11 U.S.C. § 548.

223. BJS was the initial transferees of each of the Transfers.

224. As to the Blair Transfers, JJM was the entities for whose benefit the Transfers were made.

225.     As a result, the Plaintiff is entitled to recover each of the Transfers, or the value of the Transfers, as determined by the Court, from BJS.

226.     As to the Blair Transfer, Plaintiff is entitled to recover the value of the transfer from BJS and JJM, jointly and severally.

**WHEREFORE**, the Plaintiff respectfully requests judgment as follows:

1.     That the Court avoid the Transfers made to or for the benefit of the Defendants;

2.     That the Defendants JJM and BJS, jointly and severally, be ordered to pay the Plaintiff $1,287,855.00 free and clear of any and all claims liens, interests, or other encumbrances thereon pursuant to 11 U.S.C. § 550;

3.     That the Defendant BJS be ordered to return the property transferred by the Debtor or the value thereof, as such amount may be determined by the Court;

4.     That the Plaintiff be awarded his costs and expenses including, without limitation, his reasonable attorneys' fees to the extent permitted by applicable law;

5.     That the Plaintiff be awarded interest on the judgment amount at the maximum legal rate; and

6.     That the Court grant Plaintiff such other and further relief as the Court deems just and proper.

Dated: February 4, 2022
         Charlotte, North Carolina

HAMILTON STEPHENS
STEELE + MARTIN, PLLC

*/s/ Melanie D. Johnson Raubach*
Melanie D. Johnson Raubach (NC Bar No. 41929)
525 North Tryon Street, Suite 1400
Charlotte, North Carolina 28202
Telephone: (704) 344-1117
Facsimile:  (704) 344-1483
mraubach@lawhssm.com
*Attorney for Plaintiff*

4889-8550-4267, v. 4