# **EXHIBIT A**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PENSION BENEFIT GUARANTY CORP.,

Plaintiff,

-v-

THE RENCO GROUP, INC., *et al.*,

Defendants.

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3-14-14

No. 13 Civ. 621 (RJS)
ORDER

RICHARD J. SULLIVAN, District Judge:

Plaintiff, Pension Benefit Guaranty Corp. ("PBGC"), brings this action against the Renco Group, Inc. ("Renco") and other entities (collectively, "Defendants"), alleging liability under the Employee Retirement Income Security Act of 1974, Pub. L. No. 93-406, 88 Stat. 829 ("ERISA"), and New York common law. (Doc. No. 22 (the "First Amended Complaint" or "FAC").) Now before the Court is Renco's motion to dismiss all of the state law causes of action. (Doc. No. 28.) For the reasons set forth below, the Court denies the motion.

I. BACKGROUND

A. Statutory Background

Title IV of ERISA established a pension insurance program and created PBGC, a federally owned corporation, to administer and enforce the program. 29 U.S.C. §§ 1301–1461.[1] Under that program, PBGC collects premiums from pension plan administrators and, subject to statutory

---

[1] Provisions of ERISA are often referred to interchangeably by their ERISA subdivision and by the United States Code subdivision under which they were codified. For ease of reference, Title IV of ERISA is equivalent to Subchapter III of Chapter 18 of Title 29 of the United States Code. Further, section numbers of ERISA beginning with 40 are equivalent to section numbers of Title 29 of the United States Code beginning with 13. Thus, for instance, Section 4043 of ERISA is codified at Section 1343 of Title 29 of the United States Code. In this Opinion, the Court will refer to ERISA subdivisions in the text and to United States Code subdivisions in citations.

exceptions not at issue here, guarantees payment of promised benefits. *See* 29 U.S.C. §§ 1307, 1322.

In order to protect the solvency of the insurance program, ERISA provides PBGC with several tools relevant to this case. First, if a plan terminates without sufficient assets to meet its obligations – and PBGC is thus required to pay the plan's shortfall – ERISA imposes joint and several liability for the plan's shortfall, plus interest, on any entity that sponsored the plan and, importantly here, any member of the sponsoring entity's "controlled group."[2] *See* 29 U.S.C. § 1362. Second, ERISA and Treasury Regulations require certain plan sponsors to notify PBGC no later than 30 days prior to any event that would result in an entity ceasing to be part of the plan sponsor's controlled group. *See* 29 U.S.C. § 1343(b)(3), (c)(9); 29 C.F.R. §§ 4043.29, 4043.61(b). This notification allows PBGC to investigate and take action if the entity's absence from the controlled group might leave insufficient assets to cover any plan shortfall. Third, ERISA allows PBGC to terminate a plan if "the possible long-run loss [to PBGC] with respect to the plan may reasonably be expected to increase unreasonably if the plan is not terminated." 29 U.S.C. § 1342(a)(4). As a result, upon receiving notice that a deep-pocketed entity may be leaving a controlled group, PBGC can immediately terminate the plan and ensure that the deep-pocketed entity remains liable for any plan shortfall. Fourth, ERISA allows PBGC to hold a former member of a controlled group liable for a plan's shortfall if "a principal purpose" of the transaction that

---

[2] A controlled group exists when one or more chains of corporations are connected through stock ownership to a common parent corporation and 80% of the stock of each corporation (except the common parent) is owned by one or more corporations in this group. *See* 29 U.S.C. § 1301(14); 26 C.F.R. § 1.414(c)-2. Thus, an entity is a member of a given controlled group if it either owns 80% or more of an entity in the controlled group or is 80% or more owned by entities in the controlled group.

2

resulted in that entity leaving the controlled group was "to evade liability" under ERISA. *See* 29 U.S.C. § 1369(a).

## B. Factual Background[3]

In March 2011, Renco, a private holding company, purchased Severstal Sparrows Point, LLC, which, in turn, wholly owned two subsidiaries: Severstal Warren, LLC and Severstal Wheeling, LLC. (FAC ¶¶ 5, 14.) After the purchase, Renco consolidated these corporations under RG Steel, a wholly-owned Renco subsidiary, and renamed Severstal Warren to RG Steel Warren ("Warren") and renamed Severstal Wheeling to RG Steel Wheeling ("Wheeling"). (*Id.* ¶¶ 12, 15.) Because of this structure, Renco became part of RG Steel's, Warren's, and Wheeling's controlled group (the "Controlled Group"), and would therefore have been potentially liable for any shortfalls in either Warren's or Wheeling's pension plans (the "Plans"). *See* 29 U.S.C. § 1362.

That structure did not last long. On December 16, 2011, RG Steel notified PBGC that Renco would likely be selling more than 20% of its holdings in RG Steel, which would have resulted in Renco and its other controlled subsidiaries leaving the Controlled Group. (FAC ¶¶ 24–25; *id.* Ex. B.) PBGC, in response, investigated and learned that RG Steel was facing financial difficulties and that the Plans were collectively underfunded by at least $70 million dollars. (FAC ¶¶ 26, 29, 31.) These circumstances, combined with Renco's planned exit from the Controlled Group – and thus from liability – left PBGC fearing that it would be left responsible for the Plans' shortfall. (*Id.* ¶¶ 31.) PBGC thus took a two-pronged approach to ensure that Renco remained liable. First, PBGC internally began preparing to terminate the Plans before Renco could leave the Controlled Group. (*Id.* ¶ 34); *see also* 29 U.S.C. § 1342(a)(4). Second, PBGC told Renco that

---

[3] All facts are drawn from the FAC in light of the Court's obligation to take the complaint's "factual allegations to be true and [to] draw[] all reasonable inferences in the plaintiff's favor." *Harris v. Mills*, 572 F.3d 66, 71 (2d Cir. 2009),

3

PBGC would terminate the Plans unless Renco guaranteed that it would remain liable for the Plan's shortfalls. (FAC ¶ 33.)

On January 13, 2012, a Friday, Renco assured PBGC that no sale was imminent, that no transactions under consideration involved a transfer of any of Renco's equity in RG Steel, and that Renco would be willing to agree to remain part of the Controlled Group, even if it did sell more than 20% of its ownership stake. (*Id.* ¶¶ 35, 36.) PBGC sent Renco a form standstill agreement that same day and suspended the termination process. (*Id.* ¶ 37.) Renco never signed the agreement, however. (*Id.* ¶ 38.) Instead, on January 17, 2012, the next business day after PBGC sent the agreement, Renco informed PBGC that it had sold 24.5% of its interest in RG Steel to another party and had thus narrowly left the Controlled Group. (*Id.* ¶ 39.)

Five months later, RG Steel declared bankruptcy. (*Id.* ¶ 43.) Soon after that, PBGC determined that the Plans would be unable to pay benefits when due and terminated the Plans. (*Id.* ¶ 46–48); *see also* 29 U.S.C. § 1342(a)(2). As a result, PBGC assumed responsibility for the Plans' shortfall, which by that point had grown to approximately $90 million. (FAC ¶ 49.)

### C. Procedural History

PBGC initiated this action on January 28, 2013 by filing the Complaint against Renco and its controlled subsidiaries. (Doc. No. 1.) Later, after the Court held a conference to address Renco's anticipated motion to dismiss, PBGC filed the FAC. The FAC alleges that (1) Defendants – Renco and its controlled subsidiaries – exited the Controlled Group with a principal purpose of evading ERISA liability, rendering them liable for the Plans' shortfall under Section 4069(a) of ERISA (FAC ¶¶ 50–63); *see* 29 U.S.C. § 1369(a); and (2) Renco defrauded PBGC, fraudulently concealed information about its plans to exit the Controlled Group from PBGC, and negligently misrepresented information about its plans to PBGC, in violation of New York state common law

(FAC ¶¶ 64–95). In addition, the FAC seeks declaratory judgments that Defendants are liable for the Plans' shortfall pursuant to Section 4069(a). (FAC ¶¶ 96–101.)

Renco filed its motion to dismiss the FAC's New York common law causes of action on June 21, 2013. (Doc. No. 28.) PBGC submitted its memorandum in opposition on July 17, 2013 (Doc. No. 32 ("Opp.")), and Renco submitted its reply memorandum on July 31, 2013 (Doc. No. 34 ("Reply")).

## II. Discussion

Renco makes two arguments for why the New York common law causes of action should be dismissed. First, Renco argues that PBGC lacks statutory authorization "to prosecute state law claims in federal court." (Doc. No. 33 ("Mem.") at 13.) Second, Renco argues that the state law claims are preempted by ERISA. (Mem. at 14.) The Court addresses each argument in turn.[4]

### A. PBGC Has Authority To Sue Under State Law Causes of Action

Renco claims that PBGC's ability to sue is implicitly limited by Section 4003(e) of ERISA, which states that "[c]ivil actions may be brought by the [PBGC] for appropriate relief, legal or equitable or both, to enforce (A) the provisions of [Title IV], and (B) [certain liens not applicable here]." 29 U.S.C. § 1303(e); (see Mem. at 13.) According to Renco, this authorization would be superfluous if it were not exclusive, and PBGC can therefore bring no claims other than those described in Section 4003(e). (Mem. at 13–14; Reply at 9–10.) That argument is deeply confused.

Renco's argument jumbles the two separate requirements that a plaintiff have (1) capacity to sue and (2) a cause of action to sue under. *Compare* Fed. R. Civ. P. 9(a)(2) (requiring a party to raise a lack capacity to sue as a specific denial in a pleading), *with* Fed. R. Civ. P. 12(b)(6) (allowing a party to raise a failure to state a proper cause of action by motion); *cf.* 6A Charles Alan

---

[4] Renco does not argue that the FAC fails to allege sufficient facts to state a plausible claim. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

5

Wright, et al., *Federal Practice and Procedure Civil* § 1559 (3d ed.) ("Generally, capacity is conceived of as a procedural issue dealing with the personal qualifications of a party to litigate and typically is determined without regard to the particular claim or defense being asserted."). Section 4003(e) provides PBGC with a particular cause of action under which to sue, but says nothing about PBGC's general capacity to sue. Instead, PBGC's capacity to sue is covered by Section 4002(b)(1), which states that PBGC "has the power to . . . sue and be sued, complain and defend, in its corporate name and through its own counsel, in any court, State or Federal." 29 U.S.C. § 1302(b)(1). With that blanket capacity, PBGC obviously can bring suit under any cause of action in any appropriate court – including on state law causes of action in either state court or federal court. *See* 28 U.S.C. § 1345 (granting district courts original jurisdiction over "civil actions, suits, or proceedings commenced by . . . any agency or officer thereof expressly authorized to sue by Act of Congress"). To give just one trivial example, Section 4002(b) authorizes PBGC to lease property and to enter into contracts. 29 U.S.C. § 1302(b)(5), (8). Were some party to breach its lease or contract with PBGC, PBGC would clearly have capacity under Section 4002(b)(1) to sue under state property or contract law to enforce its rights. *See Pressroom Unions-Printers League Income Sec. Fund v. Cont'l Assur. Co.*, 700 F.2d 889, 893 (2d Cir. 1983) (stating that a fund authorized to "sue or be sued" by Section 502 of ERISA, 29 U.S.C. § 1132(d)(1), would be authorized to pursue a state law contract claim).

Moreover, there is nothing in the language of ERISA to suggest that Section 4003(e) is the exclusive cause of action available to PBGC. PBGC exists partly to enforce the provisions of Title IV, and Section 4003(e) provides PBGC with the necessary cause of action to bring enforcement suits. Without that cause of action, PBGC would be no more able to enforce Title IV in court than the Food and Drug Administration would be. *See Pressroom*, 700 F.2d at 893 (holding that a party

6

cannot sue under ERISA without a statutory cause of action). However, the mere fact that PBGC is authorized to bring enforcement actions under Section 4003(e) does not suggest that PBGC is barred from bringing other actions under state law, including claims for fraud, fraudulent concealment, and negligent misrepresentation. Since Section 4002(b)(1) expressly authorizes PBGC to "sue and be sued, complain and defend, in its corporate name and through its own counsel, in any court, State or Federal," there can be no serious argument that PBGC lacks statutory authority to prosecute state law claims in federal court.

### B. ERISA Does Not Preempt PBGC's State Law Claims

"ERISA's preemption clause[, Section 514(a), 29 U.S.C. § 1144(a),] 'is conspicuous for its breadth.'" *LoPresti v. Terwilliger*, 126 F.3d 34, 41 (2d Cir. 1997) (quoting *FMC Corp. v. Holliday*, 498 U.S. 52, 58 (1990)). Nevertheless, for the past two decades, the Supreme Court and the Second Circuit have narrowly construed ERISA's preemptive force. *See Liberty Mut. Ins. Co. v. Donegan*, No. 12-4881-CV, 2014 WL 401708, at *1, *6–7 (2d Cir. Feb. 4, 2014) (discussing the shift in ERISA preemption doctrine). Under modern precedent, ERISA's text regarding preemption has been regarded as "unhelpful," and courts instead focus on "the objectives of the ERISA statute" and "begin with the assumption that Congress does not intend to supplant state law." *Gerosa v. Savasta*, 329 F.3d 317, 323 (2d Cir. 2003). As such, laws that "do not affect relationships among" "beneficiaries, participants, administrators, employers, trustees and other fiduciaries, and the plan itself," and laws that do not "tend to control or supersede central ERISA functions – such as state laws affecting the determination of eligibility for benefits, amounts of benefits, or means of securing unpaid benefits" – will generally not be preempted. *Id.* at 324. Moreover, state laws that further ERISA's "principal goal . . . [of] protect[ing] . . . the interests of participants in employee benefit plans and their beneficiaries" should not be preempted, even if

7

they go further than the protections set forth in ERISA and even if they might be inconsistent between states. *Id.* at 328–29.

Applying that standard, the Court determines that PBGC's state law claims are not preempted. The claims do not affect relationships among core ERISA groups and do not control or supersede central ERISA functions. Further, the claims help advance ERISA's purpose of protecting participants in employee benefit plans by discouraging lying to PBGC, thereby reducing the risk of insolvency of Title IV's insurance program and helping to keep premiums low.

Indeed, the claims here are nearly indistinguishable from those in two cases where the Second Circuit found the claims not preempted. In *Geller v. County Line Auto Sales, Inc.*, the plaintiffs were trustees for a plan and were suing the defendants under state common law causes of action, alleging that defendants had defrauded the plan of over $100,000 in benefits by misrepresenting that a defendant's girlfriend was an employee. 86 F.3d 18, 19–20 (2d Cir. 1996). The Second Circuit held that "allowing the plaintiffs to pursue their common law fraud claim would in no way compromise the purpose of Congress and [would] not impede federal control over the regulation of employee benefit plans. To the contrary, insuring the honest administration of financially sound plans is critical to the accomplishment of ERISA's mission." *Id.* at 23 (internal quotation marks omitted). Similarly, here, ensuring honesty with PBGC is critical to maintaining a well-functioning regulatory system. The *Geller* Court further noted that "the plaintiffs' fraud claim did not rely on the pension plan's operation or management," and that the claim merely alleged "garden variety fraud" involving an ERISA regulated plan. *Id.* at 23. Again similarly, here, PBGC merely alleges that Renco engaged in garden variety fraud, fraudulent concealment, and negligent misrepresentation, to Renco's gain and PBGC's loss, by misrepresenting its plans to leave the Controlled Group.

8

*Stevenson v. Bank of New York Co.*, 609 F.3d 56 (2d Cir. 2010), offers an even closer parallel. In that case, the plaintiff brought claims for, among other things, breach of contract and fraud, alleging that the defendant had induced him to switch jobs by falsely promising to maintain his benefits plan. *Id.* at 59–60. The Second Circuit made several arguments to support its holding that the state law claims were not preempted. First, the Circuit found that the liability did "not derive from the particular rights and obligations established by any benefit plan, but rather from a separate promise that references various benefit plans . . . as a means of establishing the value of that promise." *Id.* at 60–61 (internal quotations marks and citations omitted). Second, the state law claims did not "purport to require a plan administrator, employer, or beneficiary to follow a standard inconsistent with those provided by ERISA." *Id.* at 61. Third, even though the claims made reference to ERISA plans, "they [would] not affect the referenced plans, particularly not in a way that threatens ERISA's goal of uniformity." *Id.* at 62. Here, the duty to not make misrepresentations arises from New York common law, not anything in ERISA; the state law claims require nothing more than for entities to be honest, which is not inconsistent with anything in ERISA; and the state law claims would have no impact on the Plans.

Renco makes several arguments to the contrary, most of which are crippled by their reliance on out-of-circuit authority or cases before the modern shift in ERISA preemption doctrine. (*See* Opp. at 10.) Renco's primary argument is that the state law claims are preempted by Section 4069(a), which, as discussed above, imposes liability for a plan's shortfall on a former member of the plan sponsor's controlled group if "a principal purpose" of the transaction that resulted in that entity leaving the controlled group was "to evade liability" under ERISA. (Mem. at 9–12); *see* 29 U.S.C. § 1369(a). That provision, however, addresses an entirely different issue than the harm targeted by the state law claims. Whether Renco was attempting to evade ERISA liability by

9

selling shares in RG Steel or not, it made misrepresentations to PBGC that helped Renco save itself tens of millions of dollars at PBGC's expense. Put simply, Renco's dishonesty harmed PBGC, and that harm is actionable. The Court therefore finds Renco's arguments unpersuasive.

### III. CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED THAT the motion is DENIED. IT IS FURTHER ORDERED THAT Defendants shall answer the FAC no later than March 27, 2014. IT IS FURTHER ORDERED THAT, no later than March 20, 2014, the parties shall submit a joint letter, not to exceed three pages, describing their progress on discovery and addressing whether any amendments to the Revised Case Management Plan and Scheduling Order (Doc. No. 42) are necessary. The clerk of the court is respectfully directed to terminate the motion pending at docket number 28.

SO ORDERED.

Dated:    March 13, 2014
          New York, New York

_____
RICHARD J. SULLIVAN
UNITED STATES DISTRICT JUDGE

10