UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NORTH CAROLINA (CHARLOTTE)

|  |  |
|---|---|
| IN RE: | . Case No. 20-30141 |
|  | . Chapter 7 |
| JTR1, LLC | . |
|  | . |
| Debtor. | . |
| . . . . . . . . . . . . . . . | . |
| A. BURTON SHUFORD, TRUSTEE OF | . Adv. No. 22-03004 |
| THE BANKRUPTCY ESTATE OF | . |
| JTR1, LLC F/D/B/A/ JTR, LLC, | . |
|  | . |
| Plaintiff, | . |
|  | . |
| v. | . |
|  | . |
| RICHARD KEARNS and | . |
| YSBELL KEARNS, | . |
|  | . |
| Defendants. | . |
| . . . . . . . . . . . . . . . | . |
| A. BURTON SHUFORD, TRUSTEE OF | . Adv. No. 22-03007 |
| THE BANKRUPTCY ESTATE OF | . |
| JTR1, LLC F/D/B/A/ JTR, LLC, | . |
|  | . |
| Plaintiff, | . |
|  | . |
| v. | . |
|  | . |
| JMC FINANCIAL HOLDINGS, LLC, | . |
|  | . |
| Defendant. | . |
| . . . . . . . . . . . . . . . | . |
| A. BURTON SHUFORD, TRUSTEE OF | . Adv. No. 22-03008 |
| THE BANKRUPTCY ESTATE OF | . |
| JTR1, LLC F/D/B/A/ JTR, LLC, | . |
|  | . |
| Plaintiff, | . |
|  | . |
| v. | . |
|  | . |
| MARK MULLADY, | . |
|  | . |
| Defendant. | . |
| . . . . . . . . . . . . . . . | . |

```
A. BURTON SHUFORD, TRUSTEE OF   .  Adv. No. 22-03013
THE BANKRUPTCY ESTATE OF        .
JTR1, LLC F/D/B/A/ JTR, LLC,    .
                                .
              Plaintiff,        .
                                .
v.                              .
                                .
ETAROS ACTUARIAL SERVICES,      .
LLC, TRACI CHRISTIAN, and       .
WITKOW BASKIN,                  .
                                .
              Defendants.       .
. . . . . . . . . . . . . . . . .
A. BURTON SHUFORD, TRUSTEE OF   .  Adv. No. 22-03017
THE BANKRUPTCY ESTATE OF        .
JTR1, LLC F/D/B/A/ JTR, LLC,    .
                                .
              Plaintiff,        .
                                .
v.                              .
                                .
TMC FINANCIAL, LLC,             .
                                .
              Defendant.        .
. . . . . . . . . . . . . . . . .
A. BURTON SHUFORD, TRUSTEE OF   .  Adv. No. 22-03018
THE BANKRUPTCY ESTATE OF        .
JTR1, LLC F/D/B/A/ JTR, LLC,    .
                                .
              Plaintiff,        .
                                .
v.                              .
                                .
BJS INSURANCE, LLC and          .  401 West Trade Street
JJM, LLC,                       .  Charlotte, NC 28202
                                .
              Defendants.       .  Monday, September 19, 2022
. . . . . . . . . . . . . . . . .  9:32 a.m.
                                .
```

ADV. NO. 22-03004: TRANSCRIPT OF HEARING ON MOTION FOR RELIEF
    FROM JUDGMENT FILED BY MELANIE D. JOHNSON RAUBACH
        ON BEHALF OF A. BURTON SHUFORD [26];
                    -CONTINUED-
            **BEFORE THE HONORABLE J. CRAIG WHITLEY**
            **UNITED STATES BANKRUPTCY COURT JUDGE**

APPEARANCES CONTINUED.

```
Audio Operator:          Court ECR Personnel

Transcription Company:   Access Transcripts, LLC
                         10110 Youngwood Lane
                         Fishers, IN 46048
                         (855) 873-2223
                         www.accesstranscripts.com
```

        Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

**-CONTINUED-**

TRANSCRIPT OF ADV. NO. 22-03004:  MOTION TO INTERVENE OR
OTHERWISE BE HEARD ON THE TRUSTEE'S MOTION FOR RELIEF FROM
JUDGMENT AND ANY RELATED APPEAL AND PBGC NOTICE OF HEARING
FILED BY JOEL W. RUDERMAN ON BEHALF OF
PENSION BENEFIT GUARANTY CORPORATION [27];

ADV. NO. 22-03007:  MOTION FOR RELIEF FROM JUDGMENT FILED BY
MELANIE D. JOHNSON RAUBACH ON BEHALF OF A. BURTON SHUFORD [38];

ADV. NO. 22-03007:  MOTION TO INTERVENE OR OTHERWISE BE HEARD
ON THE TRUSTEE'S MOTION FOR RELIEF FROM JUDGMENT AND ANY
RELATED APPEAL AND PBGC NOTICE OF HEARING FILED
BY JOEL W. RUDERMAN ON BEHALF OF
PENSION BENEFIT GUARANTY CORPORATION [39];

ADV. NO. 22-03008:  MOTION FOR RELIEF FROM JUDGMENT FILED BY
MELANIE D. JOHNSON RAUBACH ON BEHALF OF A. BURTON SHUFORD [27];

ADV NO. 22-03008:  MOTION TO INTERVENE OR BE HEARD IN THE
TRUSTEE'S MOTION FOR RELIEF FROM JUDGMENT AND ANY RELATED
APPEAL AND PBGC NOTICE OF HEARING ON MOTION TO INTERVENE FILED
BY JOEL W. RUDERMAN ON BEHALF OF
PENSION BENEFIT GUARANTY CORPORATION [28];

ADV. NO. 22-03013:  MOTION FOR RELIEF FROM JUDGMENT FILED BY
MELANIE D. JOHNSON RAUBACH ON BEHALF OF A. BURTON SHUFORD [41];

ADV. NO. 22-03017:  MOTION FOR RELIEF FROM JUDGMENT FILED BY
MELANIE D. JOHNSON RAUBACH ON BEHALF OF A. BURTON SHUFORD [37];

ADV. NO. 22-03017:  MOTION TO INTERVENE OR BE HEARD IN THE
TRUSTEE'S MOTION FOR RELIEF FROM JUDGMENT AND ANY RELATED
APPEAL AND PBGC NOTICE OF HEARING ON MOTION TO INTERVENE FILED
BY JOEL W. RUDERMAN ON BEHALF OF
PENSION BENEFIT GUARANTY CORPORATION [38];

ADV. NO. 22-03018:  MOTION FOR RELIEF FROM JUDGMENT FILED BY
MELANIE D. JOHNSON RAUBACH ON BEHALF OF A. BURTON SHUFORD [26];

ADV. NO. 22-03018:  MOTION TO INTERVENE OR BE HEARD IN THE
TRUSTEE'S MOTION FOR RELIEF FROM JUDGMENT AND ANY RELATED
APPEAL AND PBGC NOTICE OF HEARING ON MOTION TO INTERVENE FILED
BY JOEL W. RUDERMAN ON BEHALF OF
PENSION BENEFIT GUARANTY CORPORATION [27]

APPEARANCES (Continued):

| | |
|---|---|
| For the Plaintiff: | Hamilton Stephens Steele Martin PLLC<br>By:  MELANIE JOHNSON RAUBACH, ESQ.<br>525 N. Tryon Street<br>Suite 1400<br>Charlotte, NC 28202<br>(704) 227-1059 |
| For Richard and Ysbell Kearns, and Mark Mullady: | Parker Poe Adams & Bernstein LLP<br>By:  PATRICIA M. ADCROFT, ESQ.<br>301  Fayetteville Street<br>Suite 1400<br>Raleigh, NC 27601<br>(919) 828-0564 |
| | Parker Poe Adams & Bernstein LLP<br>By:  ASHLEY A. EDWARDS, ESQ.<br>620 South Tryon Street, Suite 800<br>Charlotte, NC 28202<br>(704) 335-6632 |
| For BJS Insurance, LLC: | K&L Gates, LLP<br>By:  MARGARET WESTBROOK, ESQ.<br>4350 Lassiter at North Hills Avenue,<br>Suite 300<br>PO Box 17047<br>Raleigh, NC  27619<br>(919) 743-2011 |
| For Etaros Actuarial Services, LLC, Witkow Baskin, and Traci Christian: | Whelehan Law Firm, LLC<br>By:  RORY D. WHELEHAN, ESQ.<br>200 North Main Street<br>Suite 301-D<br>Greenville, SC 29601<br>(864) 908-3917 |
| For JMC Financial Holdings, LLC, and TMC Financial, LLC: | Grier Wright Martinez, PA<br>By:  JOSEPH W. GRIER, III, ESQ.<br>521 E. Morehead Street<br>Suite 440<br>Charlotte, NC 28202<br>(704) 375-3720 |
| For Pension Benefit Guaranty Corporation: | Pension Benefit Guaranty Corporation<br>By:  JOEL W. RUDERMAN, ESQ.<br>     CAROLYN LOCKMAN, ESQ.<br>445 12th Street SW<br>Washington, DC 20024<br>202-326-4020 |

```
1           (Proceedings commence at 9:32 a.m.)

2           THE CLERK:  All rise.  The United States Bankruptcy

3  Court for the Western District of North Carolina is now in

4  session.  The Honorable J. Craig Whitley presiding.

5           THE COURT:  Have a seat everyone, and good morning.

6  Okay.  We have a number of adversaries out of the JTR1

7  bankruptcy case on before us, before -- by printed docket.  I'm

8  just going to ask the Clerk to call the cases generally.  I

9  think we all know what the motions are within them.  And Clerk,

10 if you want to just ring them out.

11          THE CLERK:  Yes.  Number 1, A. Burton Shuford v.

12 Richard and Isabel Kearns.  Number 2, A. Burton Shuford v. JC -

13 - JMC Financial Holdings, LLC.  Number 3, A. Burton Shuford v.

14 Mark Mullady.  Number 4, A. Burton Shuford v. Etaros Actuarial

15 Services LLC et al., Number 5, A. Burton Shuford v. TMC

16 Financial LLC.  Number 6, A. Burton Shuford v. BJS Insurance

17 LLC, and JJM LLC.

18          THE COURT:  Okay.  I'm going to ask for appearances.

19 And if you would just say that you're in all, or if you're only

20 in -- specifically in one adversary, that will be fine as well.

21          We'll start with you, Ms. Raubach.

22          MS. RAUBACH:  Thank you, Your Honor.  Melanie Raubach

23 on behalf of the plaintiff, Trustee Mr. Shuford, in each case.

24          THE COURT:  Okay.  Good morning.

25          MR. RUDERMAN:  Good morning, Your Honor.  Joel
```

1  Ruderman, Assistant General counsel of the Pension Benefit

2  Guaranty Corporation.  Also here is my colleague, Carolyn

3  Lockman (phonetic).

4           THE COURT:  Okay.

5           MR. RUDERMAN:  We are involved in every case but one.

6  We are not involved in the case that the Trustee brought

7  against Etaros, Ms. Christian and Mr. Witkow.

8           THE COURT:  Okay.  Thank you.  Ms. Adcroft,

9  Ms. Edwards.

10          MS. EDWARDS:  Yes, Your Honor.  Ashley Edwards,

11 Parker Poe, on behalf of Richard and Ysbell Kearns, which is

12 the Adversary 22-03004, and Mark Mullady.  That adversary is

13 22-03008.

14          THE COURT:  All right.  Very good.

15          MS. WESTBROOK:  Margaret Westbrook with KL Gates on

16 behalf of BJS and JJM.

17          THE COURT:  Okay.

18          MR. WHELEHAN:  Good morning, Your Honor.  Rory

19 Whelehan appearing on behalf of Etaros Actuarial Services and

20 Traci Christian, appearing in Adversary Proceeding Number

21 22-3013.

22          THE COURT:  All right.  Anyone else?

23          MR. GRIER:  Good morning, Your Honor.  Joe Grier on

24 behalf of JMC Financial Holdings and TMC Financial.

25          THE COURT:  Okay.  Anyone else?  That it?  All right.

1 | Very good.

2 |          The motions are essentially the same in all but the

3 | Etaros matter where we don't have the intervention motion.  I

4 | don't think it would make any sense to call them separately.

5 | If you all feel differently, please weigh in.  Otherwise, we'll

6 | talk about all of them at the same time.

7 |          My suggestion on how to approach this and you all may

8 | have already had the occasion to discuss this among yourself,

9 | would be to hear both of the motions and reserve ruling until

10 | the end.  That spares me from having to take a lengthy break to

11 | just try to decide the intervention motion and before going

12 | into reconsideration and then reconsideration motion for

13 | talking about whether to reconsider into whether the merits

14 | warrant reconsideration or amendment of the earlier rulings.

15 | And for the other reason is since the PBGC, the experts in this

16 | area are here with us, whether they are allowed to intervene or

17 | not, I think it would be useful for me at least to hear what

18 | they have to say about the matter.  So if there are other

19 | thoughts of how to do it -- this, what the batting order is,

20 | I'm happy to consider them now.

21 |          So Ms. Edwards, do you want to say something?  You

22 | looked like you were ready.

23 |          MS. EDWARDS:  No, Your Honor.

24 |          THE COURT:  Okay.  All right.  But we'll take them in

25 | that order, and we will, rather than -- I'll make rulings at

1   the end or potentially take matters under advisement, before or

2   otherwise, but I would like to hear everything that we have

3   before us now.  And to the extent that I'm effectively allowing

4   PBGC to speak today, don't anyone treat that as a waiver.  I

5   just want to hear what they have to say and as I understand,

6   the request is limited.  That the request is do you want to be

7   heard about this matter, not necessarily to represent the

8   estate going forward.  Okay?

9          MR. RUDERMAN:  That is correct, Your Honor.

10          THE COURT:  Thank you, Mr. Ruderman.  All right.

11  Let's do it in that fashion.  Why don't we start with the

12  intervention?

13          Mr. Ruderman, you're welcome to either speak from the

14  counsel table or use the podium at your leisure.  We -- the

15  North Carolina practice is to stay at the counsel table, but

16  we've found our out of state guests are more comfortable at the

17  podium, so whatever suits you.

18          MR. RUDERMAN:  Well, thank you, Your Honor.  I will

19  try to do what you guys do here in North Carolina today.  I

20  appreciate you allowing me to speak today, Your Honor.

21          Once again, my name is Joel Ruderman.  I'm the

22  Assistant General Counsel with the Pension Benefit Guaranty

23  Corporation.  I am going to address the motion to intervene and

24  then after I'm done speaking, Ms. Raubach will be speaking to

25  the motion for relief from judgment.  And then I would ask to

1   then be heard on that too, if that's okay with Your Honor.

2                THE COURT:  Okay.  Yes, sir.

3                MR. RUDERMAN:  Okay.  So with respect to the motion

4   to intervene or otherwise be heard with respect to the

5   Trustee's motion for relief, it is correct, Your Honor.  We are

6   just speaking to it today to participate with regards to the

7   arguments related to the motion to dismiss and obviously, if

8   there are any future appeals, we would be continuing to pursue

9   those with regards to that issue.

10               With regards to this motion today, PBC has the most

11  at stake with respect to the Court's ruling that was already

12  entered.  With regards to the debt owed to PBC as to whether or

13  not it is an allowed claim that constitutes a debt owing to the

14  United States.  Not only will PBC's recoveries in this case or

15  in the JTR1 bankruptcy case be affected by any ruling that is

16  made in this case or these cases, but also any decision that is

17  rendered by this Court will be precedent that PBC must overcome

18  if and when PBGC seeks to bring causes of action in future

19  cases under the Federal Debt Collections Procedures Act and

20  that is one of the main reasons we are here today.

21               And I think as you've talked about previously, PBC is

22  here because it's also in the best position to explain to this

23  Court the internal operations of the agency with respect to how

24  any PBC recovery on its allowed claim for restitution against

25  the JTR1 estate is received and would eventually be distributed

1   from the PBGC.  And it also -- PBGC is here because it is in

2   the best position to help the -- educate this Court to

3   understand Title IV of ERISA.  And it's at an intersection with

4   the Federal Debt Collections Procedures Act and bankruptcy law.

5         The legal issues that are going to be argued here

6   today and the cases that were discussed by the Court in its

7   ruling were neither cited or briefed previously by any of the

8   parties.  When the Court's ruling came down, PBGC immediately

9   acted within two weeks, at the same time that the Trustee moved

10  for its relief from judgment to ask to be heard on these

11  issues.  So we don't feel that this was not timely.  We think

12  that we acted appropriately when we first learned that these

13  arguments were being raised by the Court's ruling with regards

14  to whether or not this is actually a debt owed to the United

15  States.  And therefore, we do not believe, notwithstanding any

16  of the arguments that were made by the other sides, that there

17  was any delay in us responding.

18        Further to that point, I think if you review the

19  pleadings that were made by the other parties, the motion to

20  dismiss basically relied on a case called Durango-Georgia Paper

21  v. H.G. Estate, LLC.  And I think in the Etaros decision, you

22  appropriately noted that the case was inappropriate.  It did

23  not really allot -- apply to the facts and law of this case,

24  and then there were subsequent pleadings that existed.

25        And again, I think the other parties generally relied

1    on Durango.  They did also make an argument that somehow, some

2    way, and I'm trying to understand their argument still, that

3    PBGC can't bring causes of action generally unless those

4    actions are specifically set forth under ERISA.

5          We had conferred with the Trustee at that time and

6    actually pointed the Court -- I'm sorry, the Trustee, to the

7    Renco decision, which I think clearly sets forth that PBGC does

8    have a right to bring causes of action outside of ones

9    specifically noted in ERISA.  And at that point, the Trustee

10   filed its response and pursued to represent the estate with

11   regards to the arguments that were being raised.

12         There was no mention, like I said earlier, of the

13   cases that were cited in the decision, that you know, appeal of

14   the issue of whether or not the debt is actually owed to the

15   United States.  And those are the cases that we believe are

16   pertinent to be discussed today and hopefully allow -- allowing

17   the Trustee's motion to be approved to obtain relief for the

18   judgment.  So therefore, we did come forward promptly after

19   that and we think that, as I mentioned before earlier, we are

20   the party that really has a lot at stake, not only with regards

21   to the damages in this case but also how this may affect the

22   PBC moving forward with regards to the Federal Debt Collection

23   Procedures Act.  And therefore, I would respectfully ask that

24   you allow us to participate in this proceedings -- these

25   proceedings, to deal with these issues.

1          Thank you, Your Honor.

2          THE COURT:  Thank you.  All right.  Responses?

3          MS. RAUBACH:  Your Honor, if I may just quickly say,

4    the Trustee supports the PBGC's motion to intervene for two

5    very simple reasons.  One, it seems incredibly evident that

6    this ruling would have a large impact on them and the equities

7    would favor their ability to speak before a determination of

8    the other motions, the motion to reconsider pending before Your

9    Honor, today.  And the second ground is one Your Honor alluded

10   to in opening statements.  The PBGC stands in a unique position

11   to provide perspective for the parties in this court and the

12   determination on the issues.

13         THE COURT:  All right.  Thank you.

14         MS. RAUBACH:  Thank you.

15         THE COURT:  Any other supporting statements?

16         Let me ask one more time before we get -- the request

17   here is not to intervene generally in the action going forward,

18   appeals and the like.  It is to be heard today.  Is that all --

19   the limit of the request or are you wanting something more?

20         MR. RUDERMAN:  I think it's to be heard today and to

21   any subsequent with regard to this specific issue, but nothing

22   further with regard to the Trustee's prosecution of the claims

23   in these adversary proceedings.

24         THE COURT:  Okay.  All right.  Ready to hear a

25   response.

1           MS. EDWARDS:  Yes, Your Honor.  I think that the

2    pleadings in this case are well drafted, and I'm sure Your

3    Honor has read those.  So I'll keep it short.

4           We just feel like as far as intervention, you know,

5    the three things we need to think about are how far it's

6    progressed, and delay, and why they were tardy.  And I think

7    that here, the first brief by the Trustee, I mean this -- our

8    motion to dismiss, which in essence overall argues that the

9    PBGC cannot use FDCPA.  So March 28th, we filed that, and I

10   think that put everybody on notice of what we were saying.  And

11   regardless of, you know, which line of reasoning the Court used

12   or we used, that notice that it would have an impact on the

13   PBGC's use of the FDCPA, that was on notice on March 28th.  And

14   we know that the PBGC did in fact participate, because counsel

15   for the Trustee, multiple times in the hearing referenced, I've

16   had the help of the PBGC and kind of like, I have this

17   advantage.  And so, you know, they were involved.  Thus I think

18   as far as why were they tardy, I don't know if that question's

19   answered here.  When it was possible, they knew the arguments

20   and participated early on.

21          And I think, just lastly, on the -- how far it's

22   progressed, like it is post-judgment at this point.  And you --

23   Your Honor allowed -- there was five briefs.  There was many

24   hearings.  You know, we slow played this very intentionally

25   because I think that the Court appreciated that this is a case

1  of first impression.  And I think that was the point of

2  allowing supplemental briefing.  We never objected to that,

3  anything like that.  We rode along, tried to keep costs down,

4  but giving that ample time to allow anyone that needed to

5  appear and participate to do so.

6          And I think that when you look at the Fourth

7  Circuit's cases of Dowell v. Alco., or the Baumgartner case

8  that we cited in our motion to intervene, you know, this

9  post-order is -- doesn't fit those intervention guidelines of

10  how far has the case progressed?  Well there's an order entered

11  that didn't jump out.  It was very slow in getting there, and

12  then, you know, why were they tardy?  And we don't really have

13  an answer to that, so we'll rely on our pleadings, but I think

14  that's just our take on this.

15          THE COURT:  Anyone else?

16          MS. WESTBROOK:  Your Honor, Margaret Westbrook.  I --

17  we echo and adopt all of Ms. Edwards' arguments, and we filed

18  our joinder as well.  I guess I would just point out that

19  again, I'm not really sure what capacity the motion to

20  intervene -- I mean, the motion to intervene is supposed to

21  contain a pleading that would be filed that would, you know,

22  set forth the causes of action or the defenses that the party

23  would raise and it's not here.  It's one reason why we didn't

24  consent when we were asked to do so, because we just don't

25  really understand what the position is to be heard, and I still

```
 1   don't really understand it, to be heard here and then to

 2   proceed in all other further proceedings.  It's not really

 3   clear to me what that is.

 4            I think that again, echoing Ms. Edwards' statements,

 5   we should -- the motion should be denied.  I also don't think

 6   there's any basis of mistake or fact or any cases that were out

 7   there that Your Honor wasn't aware of.

 8            And Your Honor, I neglected to introduce our newest

 9   lawyer, Mr. Ethridge (phonetic), who has joined our Raleigh

10   office.  He has passed the bar but he has not yet been

11   admitted.  I wanted to introduce him.

12            THE COURT:  Well, congratulations.

13            MR. ETHRIDGE:  Thank you.

14            THE COURT:  Mr. Whelehan?

15            MR. WHELEHAN:  Your Honor, on behalf of the

16   interested defendants, as Mr. Ruderman pointed out, we were not

17   served with the motion to intervene, although I'm just curious

18   to understand why we weren't.  We were asked initially to

19   consent and when I asked for a draft of the pleading as the

20   rule seems to indicate as Ms. Westbrook was pointing out, the

21   response was they've reconsidered and decided not to.  Although

22   it -- while our adversary has some different issues, the one

23   commonality is the use of the FDCPA, so I'm just not sure why

24   we weren't invited to the party.

25            THE COURT:  You've been heard.  Mr. Grier, anything
```

1   from you?

2           MR. GRIER:  Nothing further to add, Your Honor.

3           THE COURT:  Anything else?  Okay.  Well, let's move

4   on to the next motion.  The Rule 60/9024 motion.

5           MS. RAUBACH:  Thank you, Your Honor.  Your Honor, I

6   want to explain why we brought this motion.  When we had the

7   opportunity to review and research your written order

8   dismissing these cases, we realized that the material turning

9   points in your analysis rested on an understanding of the PBGC

10  which we had not addressed in any of the motion to dismiss

11  filings or arguments.  There were no allegations in the

12  complaint as to PBGC's, you know, source of fundings, alternate

13  cash flow upon receipt, those -- that granularity of detail

14  which ultimately proved important to the Court's determination.

15  No party raised those throughout the filings, throughout the

16  arguments so there was no point in this process for the

17  plaintiff/Trustee to fill that gap.

18          In looking at the reality of the situation, following

19  the ruling, it became apparent to us that the reality that the

20  cash flow was different enough from the point that you included

21  in your order, that we needed to bring it to you, so that Your

22  Honor had an opportunity to determine whether it made a

23  difference in your analysis or not.  So that is why we were

24  here.  That is why we have submitted what we have and I'd like

25  to discuss with you specifically what those clarifications

1   were.

2          THE COURT:  Sure.  Don't be shy about it.  I've been

3   married long enough.  I've been told that I do make mistakes.

4          MS. RAUBACH:  Thank you.  So let me first

5   acknowledge, the defendants have cited to a Fourth Circuit case

6   that references some of the PBGC's authorizing statutes,

7   Wilmington Shipping.  And the statements in the Wilmington

8   Shipping case, you know, are what they are.  They certainly

9   overlap some of the things we're discussing today.

10          I want to be clear though, Your Honor, that

11   notwithstanding Wilmington Shipping, and the Fourth Circuit's

12   statements in those case -- in that case, the reality of what

13   is happening in this case is as set forward in the declarations

14   we submitted with the Rule 60 motion.  Specifically, that the

15   benefit calculations --

16          THE COURT:  Let's stop there.  How can I get to

17   consider the declarations?  Otherwise we're in summary judgment

18   and then I've got to invite other declarations.  But you're

19   wanting me to convert this now to a summary judgment motion?

20   Is that the request?

21          MS. RAUBACH:  I'll tell you, Your Honor.  We debated

22   when framing this --

23          THE COURT:  Right.

24          MS. RAUBACH:  -- whether to submit this as a please

25   reconsider the motion to dismiss because the allegations are

1    silent, right?  Facts not stated must be construed in the

2    plaintiff's benefit.

3           The silence from the allegations should result in a

4    determination that the funds won't flow the way the Court

5    assumed they would flow.  And what we thought the best

6    procedure was, was not to rest on this absence of allegation,

7    but to present to you exactly what we had learned, and exactly

8    what we understood.  So that is why we framed it as we framed

9    it.  We wanted you to have --

10          THE COURT:  So you won't be expecting a summary

11   judgment grant here without a further opportunity for briefing

12   if that's where we end up.  If I reconsider, then I'll need to

13   give these other folks a chance to come in with

14   counter-brief -- counter-declarations, right?

15          MS. RAUBACH:  I think if you reconsider, we need to

16   do one of two things.  Yes, sir.  We either need to amend to

17   include these allegations or yes, we need to allow parties to

18   address these facts.  Yes, sir.

19          THE COURT:  Okay.  Go ahead with your argument.

20          MS. RAUBACH:  Thank you, Your Honor.  So the facts as

21   set out in those materials are that the benefit calculations

22   for the Freedom Plan participants are based on the terms of the

23   plan subject to statutory provisions set forth under ERISA.

24   Any further recoveries made by the PBGC would have no effect on

25   the participants' benefit calculations.  That further recovery

1  on these PBGC claims would flow to the PBGC's general fund from

2  which it draws its operational and administrative expenses.

3  That recovery --

4         THE COURT:  How did they convert to PBGC money

5  instead of trust money?  The Fourth Circuit, in the case you

6  just mentioned, said that notwithstanding commingling, that

7  those still remain trust monies.  So where's the alchemy?  How

8  does it get to go from trust money to government money?

9         MS. RAUBACH:  It is my understanding that the PBGC is

10 in control of the trust funds, right?

11        THE COURT:  Uh-huh.

12        MS. RAUBACH:  That the portion of the trust funds

13 which the beneficiaries can claim are set by plan and statute,

14 that recoveries in excess of that flow to the general coffers.

15        THE COURT:  What if you recovered enough to make the

16 plan solvent?  What would happen then?

17        MS. RAUBACH:  As the Wilmington Shipping case

18 discussed, Your Honor, I will tell you that that type of

19 question is exactly why I thought it was so important for the

20 PBGC to be here and be able to answer it --

21        THE COURT:  Well, I'll grill them too in a moment.

22        MS. RAUBACH:  I will freely admit that --

23        THE COURT:  But the question is that as the Circuit

24 indicates, there is an option for the PBGC, is there not?  To

25 deem the plan reinstated if you recover enough money?  So you

1  were asking about me -- whether I got off into unpled facts,

2  which I don't think I have but if I did, is that not another

3  unpled fact, that there's nothing in here saying what recovery

4  in this case is going to be like and whether or not these --

5  this plan would ever be rendered solvent?  And we know what the

6  realities are and the likelihoods are, but --

7            MS. RAUBACH:  Right.

8            THE COURT:  But there's really nothing pled there

9  either.

10            MS. RAUBACH:  Correct, Your Honor.

11            THE COURT:  All right.  Keep going.  It'll be a good

12  warm-up for arguing at the Court of Appeals.  They don't let

13  you get through a speech either.  So --

14            MS. RAUBACH:  Well, I appreciate that, Your Honor.

15            THE COURT:  I can tell you from personal experience

16  as a young lawyer.  Take a moment.

17            MS. RAUBACH:  I'm trying to find my place.  I'm

18  sorry.

19            THE COURT:  Take a moment.

20            MS. RAUBACH:  Well, Your Honor, I think I got through

21  the primary points that I wanted to point out to you from the

22  declarations, which obviously you are quite familiar with.  If

23  the declarations are accepted, what it shows as the end point

24  is that recovery on the PBGC claims flow to the PBGC coffers.

25  That does impact, I think, the analysis that Your Honor gave on

1    the cases Your Honor cited.  Right?  Because we have the Beatty

2    case, which we had referenced in our Rule 60 motion, but of

3    course, Your Honor already knew that within the case law.

4          THE COURT:  Right.

5          MS. RAUBACH:  In the Beatty case, we have the U.S.

6    Department of Labor attempting to collect back wages on behalf

7    of the employee.  The Court rules that that's not a proper

8    application of owing to the United States under the FDCPA.

9          We have Bongiorno, which is the United States

10   attempting to collect the child support restitution award.

11   Again, we have the First Circuit in that one, ruling that's not

12   a proper owing to the United States.  And then we also have the

13   Nathanson opinion that Your Honor cited on the prior Bankruptcy

14   Act, attempting to collect back pay for a private person.  And

15   in that ruling, you said not a debt owing to the United States.

16         The facts as presented by the PBGC and the

17   declarations with our motion, indicate that there is a

18   different alternate result which I think would change the

19   analysis.  And the other thing or excuse me, there were three

20   cases that we cited in our Rule 60 motions that I want to

21   discuss with Your Honor for a moment.  One of those was the

22   Rostoff case from the First Circuit.

23         In Rostoff, the First Circuit Court of Appeals

24   considered whether the FDIC could collect a restitution award

25   under the FDCPA.  The Court ruled in favor of the FDIC in that

1   case and the Court also ruled in favor of the FDC -- FDIC's

2   ability to rely on the FDCPA under the Resnick case.

3          In both of those, of course, the FDIC is -- I don't

4   know, a parallel organization of sorts to the PBGC.  It also

5   forms or it also serves kind of an insurance role.  Funding is

6   comparable.  We have Supreme Court authority indicating that

7   the PBGC was modeled after it.  So if we're looking to type of

8   organization, type of funding, all those things, I think those

9   cases are perhaps legal touchstones.

10          THE COURT:  Ms. Edwards is going to tell me here in a

11  moment, or this other side of the table's going to tell me

12  those were criminal restitution cases and not Trustee cases

13  where there's an existing trust.  So what would you say in

14  response?

15          MS. RAUBACH:  I would say, having read them, I don't

16  know that the Court makes the distinction on that basis.  There

17  were a number of cases that I read in preparing for this motion

18  which relied on criminal restitution and I did not present to

19  Your Honor because the analysis looked specifically at the

20  Criminal Restitution Act that allows for recovery through the

21  FDCPA.

22          These cases do not cite to that, the analysis to the

23  best of my recollection, doesn't go down that road.

24          THE COURT:  My recollection is the definition of debt

25  for purposes of the FDCPA also includes restitution in that

1   scenario but not when it's going to go to a third party or am I

2   wrong in that?

3           MS. RAUBACH:  The restitution is included in the

4   definition of debt under the FDCPA.

5           THE COURT:  Right.  But the cases also hold that if

6   the restitution is going to a third party, that the FDCPA can't

7   use -- can't be used, right?

8           MS. RAUBACH:  When the -- Bongiorno concludes that

9   the child support restitution --

10          THE COURT:  Right.

11          MS. RAUBACH:  -- cannot go through to a third party.

12  That's correct.  But my recollection of Rostoff in particular

13  is that --

14          THE COURT:  Take a look at your notes for a second.

15          MS. RAUBACH:  Thank you.

16          THE COURT:  I don't want to get you all --

17  restitution is expressly listed as a type of debt for which the

18  FDCPA is an appropriate collection vehicle.  That's in Rostoff.

19          MS. RAUBACH:  Yes.

20          THE COURT:  In Bongiorno, we held, however,

21  restitution debts did not qualify for collection using the

22  FDCPA.  The relevant inquiry is as to whom the debt is owed and

23  whose benefit the proceeds will inure when paid.  So basically,

24  if it's restitution that just goes to the government as a

25  matter of form, you can use it.  And if it's going to go to a

 1  third party, then you can't.

 2          MS. RAUBACH:  Yes, sir.

 3          THE COURT:  Okay?  All right.  We agree, so.

 4          MS. RAUBACH:  Your Honor, I also wanted to point out

 5  that based on the PBGC's submissions that we attached to our

 6  motion, we have -- we don't have a clean pay-in, pay-out from

 7  private parties in this case.  This isn't a contract claim

 8  obviously.  This isn't Subrones (phonetic) in which a party was

 9  trying to enforce an original two-party contract, you know, a

10  loan enforcement document.  This is a set statutory action.

11  It's a statutory enforcement mechanism, and this claim, I don't

12  believe falls within the private contract exception that's

13  articulated in Subrones.  And I wanted --

14          THE COURT:  Isn't a pension plan under ERISA law

15  considered to be a contract between employees and the employer

16  that sponsored it?

17          MS. RAUBACH:  I believe the answer to that --

18          THE COURT:  I'm asking you some of these questions so

19  Mr. -- so he can take notes and tell me what --

20          MS. RAUBACH:  No, I appreciate it.

21          THE COURT:  -- the expert answers are.

22          MS. RAUBACH:  I am happy to have him here for that

23  purpose, Judge.

24          THE COURT:  Okay.  But seriously, at the beginning,

25  an employer forms a qualified plan.  The employees effectively

 1  become participants, and I think there are cases out there

 2  saying that is effectively a contract at the outset.  If I'm

 3  wrong, please correct me but I did a lot of reading before I

 4  gave any opinions in this case, so I wanted to see if I'm right

 5  about that.  So you're saying that even though that at the

 6  beginning, the plan is there, that there is still no private

 7  contract.

 8          MS. RAUBACH:  I don't believe this is an action on

 9  the private contract.  I believe this is a claim separate and

10  apart.  And if I may, Your Honor, point to the final case that

11  I wanted to highlight for you and that I've mentioned in the

12  brief.  The FTC v. National Business Consultants case.

13          THE COURT:  Right.

14          MS. RAUBACH:  It's a case coming from the Fifth

15  Circuit.  In that case, the Federal Trade Commission obtained a

16  monetary judgment on behalf of defrauded franchisees.  FTC

17  attempted to use the provisions of the FDCPA and the defendants

18  in that case opposed the action on the argument that a debt was

19  not owing to the United States because it represented relief in

20  damages awarded for consumer redress.

21          The Fifth Circuit's reasoning, in denying the

22  defendant's argument, said that that FDCPA applies to an amount

23  that is owed to the United States.  The terms of the judgment

24  in this case which stand in the FTC's name render it owing to

25  the FTC and not to private individuals, and it goes on to say

1  that although a portion of the judgment representing the

2  damages may ultimately be paid, nothing in the statutory text

3  requests the government be the exclusive beneficiary.

4          And if I may have a quick moment to --

5          THE COURT:  Okay.  take a moment.

6          MS. RAUBACH:  -- recheck --

7          THE COURT:  But if you're changing topics, I want to

8  ask a question about the FTC.

9          MS. RAUBACH:  No.  I'm going to stick with the FTC.

10 If you could just let me verify one thing before I make

11 representations --

12         THE COURT:  Please go ahead.

13         MS. RAUBACH:  -- to Your Honor.  I will skip that

14 addition.  What's your question, sir?

15         THE COURT:  I hope I haven't gotten you rattled.

16 This is --

17         MS. RAUBACH:  No, I appreciate it.

18         THE COURT:  If you need a moment, what we'll do is

19 I'll go on and then afterwards, you can come back in if you

20 missed a thought.  So here's my question.

21         Isn't there a fundamental difference between the PBGC

22 acting as a Trustee here and the FTC?  I mean -- my

23 understanding is the FTC, and this comes from its website

24 yesterday.  I looked.  The FTC is a federal government agency

25 that has a budget appropriation from Congress annually.  And

1   that none of the -- that's the first distinction.

2           The second is none of the money collected in FTC

3   lawsuit goes to the FTC.  It goes back to the Treasury, which

4   definitely would up it under the FDCPA.  And effectively, the

5   FTC's costs, attorneys, and staff are paid a salary from the

6   annual budget appropriation.

7           I think I am entitled to rely on adjudicated facts,

8   but isn't there a fundamental difference between the FTC and

9   the PBGC when it comes to FDCPA -- it's an alphabet soup.  I'm

10  sorry.  But when it comes to FDCPA matters, the two are not at

11  all alike, are they?

12          MS. RAUBACH:  Well, they are both the United States

13  for purposes of the definition of that act.  So --

14          THE COURT:  Are they?

15          MS. RAUBACH:  -- I hear what Your Honor is saying,

16  obviously.  But I think yes, based on the definitions under the

17  FDCPA, they are.

18          THE COURT:  Okay.  Show me the part of the definition

19  that covers the PBGC as it is here.

20          MS. RAUBACH:  I'm sorry.  Say that again, sir.

21          THE COURT:  The definition of debt to the United

22  States; which part of it applies?

23          MS. RAUBACH:  The definition of debt?

24          THE COURT:  Right.  The one that we're talking about

25  under the FDCPA.  Let me see if I can find my notes.  I'll

1    help.

2            MS. RAUBACH:  Your Honor, I have the definitions if

3    you want them.

4            THE COURT:  Okay.

5            MS. RAUBACH:  Do you want me just to put -- this will

6    be part, yeah.  Here's the definitions.

7            THE COURT:  Okay.  Thank you.  All right.  It comes

8    in two or three parts and maybe I ought to be asking

9    Mr. Ruderman this question.  But debt, in Subpart 3, says

10   amount owing to the U.S. on account of a direct loan.  The U.S.

11   didn't make a loan, right?

12           MS. RAUBACH:  No, sir.

13           THE COURT:  Okay.  So we don't have that.  Or a loan

14   insured or guaranteed by the United States.  We don't have a

15   loan so we don't have a guaranty.

16           MS. RAUBACH:  No, sir.

17           THE COURT:  So we go to the next subpart.  I assume

18   this is the part you're talking about, so amount owing to the

19   United States on account of -- and then there's a laundry list

20   there.  Tell me which part covers this situation.

21           MS. RAUBACH:  For their claim in this case, I think

22   it could be recovery of a cost incurred by the United States.

23   The PBGC is paying out these guaranteed benefits from the

24   revolving funds from which it also draws its operational and

25   administrative costs.  They are paying those prior to any

1    recovery.  I think the claim could be for recovery of a cost

2    incurred.

3               I am going to have to defer to Mr. Ruderman on this,

4    because I don't know how these statutory claims --

5               THE COURT:  Right.

6               MS. RAUBACH:  -- are classified.

7               THE COURT:  I'm just trying to --

8               MS. RAUBACH:  But I also assume that it falls under

9    fine, assessment, penalty.  And this is an action to recover

10   damages caused under a statutory right.  So which of those

11   umbrellas it falls under specifically, I will have to defer.

12              THE COURT:  That's okay.  I wasn't looking for an

13   argument.

14              MS. RAUBACH:  But I would imagine that --

15              THE COURT:  I was wanting to identify what the

16   contention was.  Okay.  All right.  Anything else?

17              MS. RAUBACH:  I will be happily corrected when we

18   hear from the folks who understand it better than I do, Your

19   Honor.  But those are the ones that --

20              THE COURT:  So will I.  All right.  Anything else,

21   Ms. Raubach?

22              MS. RAUBACH:  Your Honor, I think that covers it.

23              THE COURT:  Okay.

24              MS. RAUBACH:  Thank you.

25              THE COURT:  I think it might be most useful to -- I

```
 1   understand the PBGC agrees with the Trustee and I could listen

 2   to you next, Mr. Ruderman, but it might be more useful to get

 3   all the sniping and shots taken at you first and then you can

 4   tell us why all those are all wrong as well as what I did

 5   earlier, okay.

 6              Ms. Edwards?

 7              MS. EDWARDS:  Thank you, Your Honor.  I had intended

 8   to stay short because I did think it's pretty well briefed in

 9   general.

10              THE COURT:  That and the firm retreat was this

11   weekend.

12              MS. EDWARDS:  That's right.  You -- you've got me.

13              THE COURT:  Mr. Fajgenbaum and I were talking

14   football so I understood that the Parker Poe retreat was over

15   this weekend.

16              MS. EDWARDS:  That's right, and as a brief pause, he

17   hit a hole in one on the 18th hole.

18              THE COURT:  Well, I'm glad to get verification of

19   that.  I heard that assertion but --

20              MS. EDWARDS:  That's a fact.

21              THE COURT:  In any event.

22              MS. EDWARDS:  So not to get sidetracked --

23              THE COURT:  For your benefit, he used to be a law

24   clerk down here as did Ms. Edwards.  So all right.  Go ahead.

25              MS. EDWARDS:  Yes, Your Honor.  Not to get
```

1  sidetracked.

2           As a threshold issue, and this is in the pleadings;

3  I'm only going to speak about it shortly.  We're here on Rule

4  60.  I don't think that the Trustee has cited any case law that

5  supports the two sections that they cite, which is 60(b)(1) and

6  (6):  mistake, inadvertence, surprise, or excusable neglect.

7  Any other reason justifying relief from the operation of the

8  judgment.  This concept of mistake, I don't know if -- I mean,

9  this is a case, but if it's supposed to be the Court's mistake

10  or what's going on here.

11           THE COURT:  I'm pretty sure that's the one.

12           MS. EDWARDS:  I think that's what was being alluded

13  to, but that's no different than any other, you know, ruling,

14  any other adverse ruling.  And I think as far as kind of the --

15  what's happening on the last -- you know, the last minute and

16  being surprised, if you were able to look at the Williams case,

17  and I have that, although I've got a lot of stacks here.

18           THE COURT:  I had that.

19           MS. EDWARDS:  Oh here.  I do.  I'll pass that one up.

20           This one is from the East (indiscernible) -- this

21  one's from the Eastern District of North Carolina.  I think

22  this actually -- well notes exactly in Rule 60 -- it's actually

23  Wells Fargo, you know, they were surprised by a last minute

24  pleadings of didn't know it was going to go in this direction

25  and they wanted to supplement with declarations.  I think this

1  specifically speaks to how it's just not appropriate for the

2  declarations.  And you know, they were -- they could have said

3  they believed would provide clear evidence that Ms. Williams

4  intended to enter into the transaction described.

5         Kind of similar to what we're hearing today.  And if

6  -- and this was, you know, could you change it to summary

7  judgment?  You can rest -- resist the motion on the merits or

8  you can exercise your right to request additional time and kind

9  of supplement and add to here.

10         It says no -- and the Court found in this case, and

11  this is a district court case, no evidence has been proffered

12  that was not available to the parties prior to the summary

13  judgment hearing.  Moreover, the documents the defendants now

14  assert may establish Ms. Williams' intent were from their own

15  client files.  Since the motion has been pending for five

16  months, that's also pretty similar, there was ample opportunity

17  to review their own records.  And the court there found again,

18  the declarations were inappropriate.

19         So I just, you know, I don't want to pass over that

20  small threshold issue that -- we didn't see any case law that

21  provides that the declaration should be considered.  We also

22  didn't see anything that puts this into an appropriate category

23  under Rule 60.  I know you've heard many Rule 60 arguments.

24  I've argued many Rule 60 arguments, and I don't believe there's

25  any analogous case in which this could be considered mistake as

1  cited in our briefs.  The case law is from 1999 to 2000 --

2  2021, all prior, again, we slow played this.  There was ample

3  opportunity there.

4         So that's kind of the point on Rule 60.  That's the

5  question today.  That's what you're looking at, those factors.

6  Do they meet them?  I think the answer is no.

7         But I also couldn't help myself in looking at this

8  issue and I feel like Your Honor may have stolen my thunder a

9  teeny bit but that -- that's where we're going.  So just very

10 quickly, if I may approach.  This is the case cited by the

11 Trustee on the Rostoff case.

12        I think what you are looking at is also the issue

13 here.  Oh, to quickly go to the FTC v. Business Consultants

14 Inc., case, I think what you asked Ms. Raubach was, what did

15 the FTC sue as?  The answer was plaintiff-appellee.  It was not

16 Trustee.  And so just to quickly answer that and we'll get to

17 the difference on that.

18        I have what we were here -- what we're here on, if I

19 may approach.  What we're looking at here today --

20        THE COURT:  Thank you.

21        MS. EDWARDS:  The Pension Benefit Guaranty

22 Corporation, as statutory Trustee of the retirement plan of

23 Freedom Communications.  So I think Your Honor honed in exactly

24 on that.  In this case, they are the statutory Trustee.  And in

25 that FTC case, they are plaintiff-appellee.

1          So why does that matter?  Okay.  So if you turn to

2    Page 5 of that Rostoff case, which they cite.

3          THE COURT:  Okay.

4          MS. EDWARDS:  And I think Your Honor may have

5    actually also been talking about what I was going to talk

6    about.

7          THE COURT:  Keep your argument together and just make

8    it and don't worry about --

9          MS. EDWARDS:  Sure, okay.

10          THE COURT:  -- what I said.

11          MS. EDWARDS:  Because the definition of debt under

12   the FDCPA expressly excludes amounts owing under the terms of a

13   contract originally entered into by only persons other than the

14   United States.  Also, the Rostoffs cite a snippet of

15   legislative history to the effect that a loan made by a failed

16   federally insured bank would not be collectible under the

17   FDCPA.

18          Hence, they concluded that the restitution in this

19   case is not a debt under the FDCPA.  Then the Court says, we do

20   not accept this argument.  The Rostoff's debt is owing under an

21   order of restitution, not under the terms of a typical private

22   contract such as a loan agreement.  First, the victim

23   identified in the restitution order is the FDC -- FDIC.  Thus,

24   neither the definitional exclusion nor the cited legislative

25   history is inapposite.  Debt is defined broadly to include

1  amounts owing to the United States on account of a loan insured

2  or guaranteed by the United States as well as other amounts

3  originally due to the United States.

4        So Your Honor was exactly correct.  That puts us and

5  I already passed up the exact definition of debt under 3002,

6  and that goes with, on account of a direct loan or loan insured

7  or guaranteed by the United States.  That's Section (a), right?

8  That's 3(a).  That's not us.  We are not the FDIC.  We are

9  different than the FDIC.

10        The PBGC is Trustee of the Freedom Plan.  That's how

11 these cases are filed.  That's what they're acting under.  So

12 we drop into (b), an amount that is owing to the United States

13 on account of a fee, duty, lease, you know, all those things.

14 We go -- comma, but that, is not owing under the terms of a

15 contract originally entered into by only persons other than the

16 United States.

17        So just like many statutes, broad, broad, broad,

18 limiting.  And here, broad, broad, broad, but we have to -- but

19 we can't ignore the limitation.  We're not -- we're not Section

20 (a), loan, loan guaranty, totally separate Section.  We -- the

21 only thing that could apply is (b) and if we're going to drop

22 into (b), we can't ignore that limitation.  But that is not

23 owing under the terms of a contract originally entered only by

24 persons other than the United States.

25        I don't think anyone would say this is not employee-

1  employer.  I don't know that we have to be experts in the PBGC

2  to know what the -- what was originally entered into.  So I

3  think right there, it's but not as.  We cannot ignore that

4  point.  And secondarily unlike every case that's cited, right,

5  so these new cases that are really important, they are always

6  as the victim.  They are the plaintiff, the appellee.

7          Here, we are Trustee.  And so, you know, even in this

8  question -- they -- I think somewhere in this Rostoff, it says

9  like that's the important - oh, here.  The controlling question

10  remains.  So this is their case.

11          The criminal -- the controlling question remains.

12  Who will receive the beneficial interest?  In this case, it's

13  the government.  Therefore, the FDCPA is a proper collection

14  vehicle.  Understood.

15          So who is -- who will receive the beneficial interest

16  here?  It's the -- it's their trust.  It's for the Trustee.

17  And so that question is then answered by the Fourth Circuit.

18  Like we have controlling law in this area, specifically in the

19  Fourth Circuit.  We don't have to look any further.

20          And the Fourth Circuit said, and this is cited in our

21  briefs too.  When the PBGC is appointed as statutory Trustee

22  over a terminated plan, it wears two hats.  One is guarantor of

23  ERISA's insurance programs under Title IX of -- sorry, Title IV

24  and I as Trustee.  The cost of the PBGC insurance is borne

25  primarily by employers that maintain ongoing pension plans.

1          In other words, the insurance is financed primarily

2   by employers and secondarily by statutory liability imposed on

3   employers who terminate underfunded pension plans.  So they are

4   -- and then they also -- to commit -- they may, as Trustee,

5   commence, prosecute, or defend on behalf of the plan or any

6   suit proceeding involving the plan.  So this is not collecting

7   for the sovereign which is the government.  Like you said, like

8   we're not building roads.  We're not -- this is not going to

9   pay government employees.  This -- the Fourth Circuit says,

10  it's for the plan.  It's for this trust that goes back to

11  employees.  Assets that they saved, assets that were recovered

12  through litigation in the trust, for the plan.

13          And so, I think that unlike the cases that they

14  cited, the trust makes it completely different, and the Fourth

15  Circuit has already answered this question.  I don't think

16  they've cited anything in the case law on why they should be

17  able to set aside.  And I should have left all this argument

18  alone, but I just couldn't because I don't think it's fair

19  anyway, Your Honor.  You were correct the first time.  And we

20  don't need to open this back up.

21          Not to mention as I'm sure maybe my colleagues may

22  mention that these are individual people with limited

23  resources.  And this many, many bites of the apple is

24  incredibly costly to them.  That's all I have for right now,

25  Your Honor.

1          THE COURT:  Okay.  Very good.  Ms. Westbrook?

2          MS. WESTBROOK:   Your Honor, I just again echo

3  Ms. Edwards's arguments that we've worked on altogether.  She

4  did an excellent job.

5          I just say big picture here, I've also been married a

6  long time to know that I'm often wrong.  I -- it's also not the

7  first time I've ever been to court where an issue that the

8  parties seized upon immediately or briefed or -- and the

9  esteemed jurist took us in a different direction and may have

10  alluded to or found different issues to be the most important

11  or that the case turned on that.

12          I don't think there's a mistake here.  I think it's

13  just a matter of really good lawyers and a great judge dealing

14  with novel issues of fact here.  And therefore, I think that

15  regardless of what was briefed or what was argued originally,

16  we've gotten to the bottom of it, and I think now everything

17  should have been reviewed and is out there and there's really

18  no reason to review anything other than for Your Honor to make

19  a determination here.  But to open this up would be extremely

20  costly to the parties who've already had -- this is hearing

21  number 4, I believe.   Thank you.

22          THE COURT:  Mr. Whelehan?

23          MR. WHELEHAN:  Good morning, Your Honor.  As

24  Ms. Edwards and Ms. Webber -- Ms. Westbrook had stated, I guess

25  this would fall in the piling on category, but the issues that

1   the Etaros defendants focused on were the procedural right to

2   reconsider and then the substantive right to reconsider.  I

3   think the procedural might fall in the sniping, but I think at

4   the end of the day, under the recent Supreme Court of United

5   States v. Kemp decision, I think it would be appropriate for

6   them to reconsider based on the Court's mistake of law.

7           That would, I think, move to the substantive reasons.

8   And I think as Ms. Edwards pointed out, the case law that the

9   Trustee cites, I think, itself supports your Court's ruling,

10  that so long as the debt is not directly a debt of the United

11  States, and I think these cases make that distinction of being

12  debts to the United States.  The restitution debts, the FTC

13  case.  I think in that opinion, Your Honor, there's language at

14  some point in the case where the Court notes that the FTC may,

15  but doesn't require, that whatever recoveries are engendered

16  could be paid to the franchisees in that decision.

17          I think the Rostoff case which has been cited by -- I

18  think by all of us, I think, is the key because I think that

19  case clearly supports the Court's ruling because that case is

20  showing that in looking at the definition of debt, if it's not

21  a federally insured loan or some type of federally insured

22  instrument, which I think we don't have any dispute that that's

23  the case here, you then go to the second part.  And I think if

24  you go through all of that language and then come to the end

25  where the Court notes that except any contract originally

1    provided or entered into or provided by private parties would

2    not fall within the definition of debt subject to the

3    triggering of the act.  So again, just in the piling on

4    category, Your Honor, I think the cases that the Trustee cites,

5    I think, don't really change the analysis and I think support

6    the Court's analysis.

7         As far as the declarations, I guess, that would be

8    the other substantive basis.  I -- obviously that has a

9    procedural subpart as to whether they're appropriate but even

10   if they are appropriate to be considered, I'm not sure what

11   they really do other than explain how monies are received and

12   used.  But I just don't see that there's any basis that says

13   that those monies would go directly to the PBGC as sort of a

14   direct recovery on something owed to them.

15        THE COURT:  All right.

16        MR. WHELEHAN:  Thank you, Your Honor.

17        THE COURT:  Mr. Grier, anything further from you?

18        MR. GRIER  Nothing further, Your Honor.

19        THE COURT:  Okay.  Do you need a moment or are you

20   ready to jump in?

21        MR. RUDERMAN:  I'm ready to go, Your Honor.

22        THE COURT:  All right.

23        MR. RUDERMAN:  Thank you.  Once again, I appreciate

24   your time, the opportunity to be heard today on these issues.

25   There are two issues that were raised by you, Your Honor, that

1   I think really need to be addressed at the top.

2           THE COURT:  Okay.

3           MR. RUDERMAN:  I'm debating on which one to address

4   first, but I think I'm going to address the statute itself, the

5   FDCPA.

6           So and I appreciate opposing counsel providing

7   everybody a copy today because this will make it a little bit

8   easier.  So if you take a look at 3002, first, and I don't

9   think this point is disputed.  Under Subsection 15, it points

10  to the fact that the United States means a federal corporation.

11          THE COURT:  Right.

12          MR. RUDERMAN:  Okay.  And I think if you look at 28

13  U.S.C. 3002(a)(15), I'm sorry -- 3002(a) -- I'm sorry.  I'm

14  citing the wrong statute.  I'm a little bit nervous.  I

15  apologize.

16          If you look at 13 -- 29 U.S.C. 1302(a), which is

17  under ERISA.  29 U.S.C. is ERISA.  And you go to Section (a),

18  it points out, there is -- established within the Department of

19  Labor, a corporate -- body corporate to be known as the Pension

20  Benefit Guaranty Corporation.  So I don't think there's any

21  dispute that the PBC is a federal corporation.

22          THE COURT:  Not at all.  I think I found that.

23          MR. RUDERMAN:  Okay.  Thank you.  So then we move on

24  to the second part of the FDCPA that talks about debt.  And

25  again, we're not dealing with (a), an amount that is owing to

 1   the United States on account of a direct loan or a loan insured

 2   or guaranteed by the United States.  We get into Section (b)

 3   that has a laundry list of types of debts that are debts owed

 4   to the United States.  And there is a -- an exception at the

 5   end and we'll address that in a moment, dealing with contract

 6   claims.

 7           And as my colleague, Ms. Raubach, pointed out, there

 8   are several places that we can go to -- under (b) to suggest

 9   what PBC's claims are.  I think the most noted and the two that

10   apply the most in my mind are restitution and damages.  And

11   here is where you can see that these are claims for restitution

12   and damages.  PBGC filed an allowed claim in this case.  And

13   you take a look at the PBC's allowed claim in this case.  It's

14   been allowed pursuant to the settlement agreement, and you look

15   on Page 11.  It discusses the district court action that was

16   brought by PBGC.

17           THE COURT:  All right.

18           MR. RUDERMAN:  And it specifically says the district

19   court action asserted claims against debtors for two counts of

20   non-fiduciary participation in prohibited transactions under

21   ERISA.  What does that mean?  That means ERISA sets forth in

22   the statute, certain transactions that are prohibited and the

23   PBGC has a right to sue on account of any time that a party

24   commits a prohibited transaction with regards to what was

25   ultimately a Trustee plan and that's what PBC did.  We sued for

1  the prohibited transaction and obtained relief in the same

2  manner that the FTC sought undress -- redress with regard to

3  the fraudulent actions that occurred in the underlying case

4  there.  PBGC is seeking relief for the fraudulent, prohibited

5  transactions that occurred.  And we are entitled to restitution

6  and as I pointed out, this is an allowed claim in this case.

7  This is not a contract case.  This is a case in which PBC

8  brought its claims originally for a prohibited transaction

9  which it's entitled to do under the statute.

10         So for all of those --

11         THE COURT:  In what capacity?  I mean, were you

12 bringing them as guarantor?  You're bringing -- the complaint

13 says you're bringing them as Trustee.

14         MR. RUDERMAN:  We brought it as Trustee.

15         THE COURT:  Okay.

16         MR. RUDERMAN:  I don't deny that.

17         THE COURT:  All right.

18         MR. RUDERMAN:  Okay.

19         THE COURT:  So and the proof of claim is sort of the

20 same.  Everything is talking about damage to the plan.

21         MR. RUDERMAN:  Exactly.

22         THE COURT:  Right?

23         MR. RUDERMAN:  Okay.

24         THE COURT:  Okay.  Go ahead.

25         MR. RUDERMAN:  Okay.  So now that that's actually a

1    great segue into the second point that I want to make.  And I

2    want to point the Court now to ERISA Section 4042 which is also

3    known as 29 U.S.C. 1342.

4            THE COURT:  Okay.

5            MR. RUDERMAN:  And this is very interesting because

6    it goes to the point of what the Court was doing in Wilmington

7    Shipping.  In Wilmington Shipping -- let me just set a little

8    background here.  First of all, that was another case in which

9    the appeal was based -- was between two private parties.  The

10   PBGC did not participate in the appeals in that case, and as a

11   result, PBC was not heard in that case.  And thankfully we're

12   being heard here today with regard to this case so that we

13   don't have some rulings that the agency may not agree with

14   generally anyways.  I don't think that that was the holding in

15   that case.  I think it was background that the Court was

16   providing in discussing how the PBC operates.

17           Excuse me.  My mouth is dry.  How the PBGC operates,

18   okay.  But if you look at the Wilmington Holdings case, it does

19   cite to this specific statute, and it talks about the fact that

20   the corporation is authorized to pull assets of terminated

21   plans -- of terminated plans.  And then the case stops there

22   and then it says, see 29 U.S.C. 1342.  But the statute goes on.

23   And the statute specifically says, the corporation is

24   authorized to pull assets of terminated plans for purposes of

25   administration, investment, payment of liabilities of all such

1  terminated plans.  So it's not just talking about the plan in

2  that case.  It's talking about all terminated plans in plural

3  that the PBC takes in.  But then, the next -- the final clause

4  of that paragraph, I think, is the most telling, and it goes

5  directly to the declarations that were provided today.

6        It goes on to say, and such other purposes as it

7  determines -- it being the PBGC, to be appropriate in the

8  administration of this title.  And that title is Title IV,

9  which authorizes the PBGC to act.  So that language

10 specifically gives the agency the authority to take these

11 Trustee plans in and use the money, not only to pay benefits to

12 participants, but it also allows the PBGC to bring it into its

13 coffers, to use it for the administration of the agency.  And

14 it's right there in the statute, Your Honor.

15        THE COURT:  So the PBGC hit a home run and recovered

16 enough money to almost make a plan solvent.  You're telling me

17 it would have the right to keep the money itself for its own

18 purposes and not pay more money to the plan beneficiaries?

19        MR. RUDERMAN:  There are other provisions in ERISA

20 that talk about how money that comes into PBC is distributed to

21 the participants.  And most notably 1320, 4022 of ERISA.

22        THE COURT:  I don't have that in front of me.  Tell

23 me what it says.

24        MR. RUDERMAN:  But -- and I'm not an expert on 4022,

25 but basically it provides as a bankruptcy judge, you'll

1  appreciate this, a waterfall --

2          THE COURT:  Right.

3          MR. RUDERMAN:  -- of how that money is used.

4          THE COURT:  Right.

5          MR. RUDERMAN:  And it provides that once you get past

6  the guaranteed benefits, that the PBGC receives, then it

7  provides a waterfall how that money gets paid.  And there's

8  actually a sharing mechanism under the statute that provides

9  what money goes generally into the PBGC and what money can

10 additionally be used to pay benefits to participants.

11         THE COURT:  Does any of the money ever get to the

12 U.S. Treasury?

13         MR. RUDERMAN:  No, but I don't think that's relevant.

14         THE COURT:  I do.

15         MR. RUDERMAN:  Okay.  No, I hear you and I think you

16 -- I'm going to try to persuade you through this and I'm doing

17 my best to try to persuade you.

18         THE COURT:  Right.  I'm listening.

19         MR. RUDERMAN:  Okay.  We are a federal corporation.

20 We are the government.  That's what the statute requires.  The

21 statute has no where in there that it says that money has to go

22 into the Treasury.  It says it has to go to the government.  We

23 are the government.  There's no dispute there.

24         The only question then at that point is just is

25 whether it's a debt owed to the government and this is a debt

1  owed to the government.  And here's -- you know, I don't think

2  the cases that you cite are wrong.  If you look at the case --

3  I don't want to get the names wrong so let me just check my

4  notes.

5          THE COURT:  Okay.

6          MR. RUDERMAN:  But if you looked at the case -- for

7  example, in Beatty, there were back wages owed to the former

8  employee.

9          THE COURT:  Right.

10         MR. RUDERMAN:  Okay.  That was a case where an

11  employee was not paid its wages, and there was an

12  administrative order entered in favor of that individual.  And

13  at that point, when money is brought in, to the -- under that

14  order, that individual only gets paid to the extent that they

15  successfully recover the money.  Okay.

16         So in those instances, yes, the government is only

17  recovering money for purposes of the individual.  Here, the

18  PBGC as we already alluded to, is recovering the money in part

19  to replenish its coffers.  But you have to understand factually

20  what happens here when a plan is terminated.

21         In 2016, this plan was terminated.  PBGC took

22  actions.  It's a large plan.  I mean, this is 150 -- well more

23  than -- $150 million -- over $100 million was the damages that

24  occurred as a result of all these people that here they are

25  telling us how, you know, that they're being badly affected.

1  They cost the government over $100 million.

2         But notwithstanding that, the PBGC took in this plan

3  and then almost as soon as possible, in 2017, as required by

4  the law, started paying benefits.  We're an insurance agency.

5  We're providing insurance.

6         THE COURT:  Right.

7         MR. RUDERMAN:  Those damages that are incurred by the

8  participants are paid for by the government.  The government

9  stepped in and pays those losses.  They are made whole or to

10  the extent possible -- there are limitations, by the

11  government.  That is not like the government --

12         THE COURT:  No government money involved.

13         MR. RUDERMAN:  What?

14         THE COURT:  No government money involved, but the

15  government failed.  Right?

16         MR. RUDERMAN:  Well, the government is paying from

17  its coffers.

18         THE COURT:  From the insurance premiums.

19         MR. RUDERMAN:  The insurance premiums.

20         THE COURT:  From the recoveries.

21         MR. RUDERMAN:  The recoveries.

22         THE COURT:  And from the money that you take from

23  those two and you get earnings.

24         MR. RUDERMAN:  Okay.

25         THE COURT:  All right.

```
1              MR. RUDERMAN:  I'm listening.

2              THE COURT:  So where is the government money?

3              MR. RUDERMAN:  I'm going to segue a little bit.

4              THE COURT:  Okay.

5              MR. RUDERMAN:  Because we've heard a lot today about

6    the FDIC.  And I think as Ms. Raubach commented previously, the

7    F -- the PBC is modeled directly after the FDIC.  And the FDIC

8    -- and that's been expressed by the Supreme Court.  So the

9    Supreme Court, the FDIC as you've seen in several of these

10   cases, has been allowed to proceed under the FDCPA.  And the

11   FDIC is essentially the same type of corporation.  It is an

12   entity that has member banks that pay premiums to pay to

13   support the agency to allow it to exist.  And then when losses

14   are incurred, a insurable event, just like we did with the

15   pension plan when the pension plan terminated, excuse me --

16   terminated, given an insurable event, the FDIC, I think it was

17   the Rostoff case, the Court pointed out, stepped in, and paid

18   approximately -- I just want to make sure I got the right case.

19             THE COURT:  All right.  Take a moment.

20             MR. RUDERMAN:  No, I'm sorry.  It's the Resnick case.

21   The court stepped in -- I'm sorry, the FDIC stepped in to

22   protect depositors by paying approximately $9.75 million to

23   cover the losses of the depositors.

24             THE COURT:  Are we talking about Rostoff now?

25             MR. RUDERMAN:  No, I'm sorry.  I said that wrong.
```

1   Resnick.

2           THE COURT:   Resnick?

3           MR. RUDERMAN:  Yes.

4           THE COURT:  Okay.

5           MR. RUDERMAN:  The FDIC stepped in just like we

6   did -- we stepped in back in 2016, and we started paying

7   benefits.  The FDIC had an insurable event in the same way that

8   we had an insurable event and it stepped in and started paying

9   losses.

10          THE COURT:  Do you have Resnick in front of you?

11          MR. RUDERMAN:   I have my own --

12          THE COURT:  Version?

13          MR. RUDERMAN:  -- copy.

14          THE COURT:  Okay.  My question is, and I am asking

15  you, not arguing with you, from it, --

16          MR. RUDERMAN:  Yes.

17          THE COURT:  I know Rostoff was -- was Resnick a case

18  that involved criminal restitution owed to the government?

19          MR. RUDERMAN:  It may have been but I don't think

20  that's relevant.  I think the fact is there's an order of

21  restitution owed that's going to reimburse the government for

22  its obligations.  I will tell you, I've been in at least two

23  cases off of the top of my head where I have also brought

24  claims that we obtained -- for there was a termination of a

25  pension plan and the -- because it's a criminal case, the court

1  went out and got a restitution order.  But we are collecting

2  funds from the restitution order that was in a criminal case.

3  I don't think the difference -- I don't see in the statute

4  where it talks about criminal versus civil.

5          I think we're looking at the plain language of the

6  statute.  I think the concept is that it's a restitution order

7  for funds that are actually owed to the government.  And just

8  like with the FDIC, these are funds that are owed to the

9  government.  The government is out there collecting this money

10 so that it can reimburse its coffers and that's what exactly

11 happening here too.  The PBGC is out there seeking and it's

12 even a further point because the benefits have already been

13 paid.  And they're not the way we operate.  And this gets a

14 little bit technical.

15         But the way we operate, those benefits have already

16 been decided.  All the money that these individuals are going

17 to get is based on the terms of their pension plan and the

18 limitations of the statute.  And therefore, and as set out in

19 the declaration by my colleagues at the PBGC, there will be no

20 additional increases regardless of whether or not the PBGC

21 recovers any money in this case.

22         What will happen is the PBGC's coffers will be filled

23 and bring this all back full circle.  That is why we think

24 there's a factual mistake.  Because there -- this is a case in

25 which the money is going to a federal government agency.  It's

1    going into our coffers and it'll be used by the PBC in a trust

2    fund with billions and billions of dollars of money and

3    ultimately that money will then potentially make its way to its

4    revolving fund where it may be used to pay participants -- pay

5    benefits to participants but it just as likely may be used for

6    excuse me --

7            THE COURT:  Go ahead.

8            MR. RUDERMAN:  For the administration of the PBGC and

9    other general government functions.  And we're entitled to do

10   it.

11           THE COURT:  So when did the transformation occur?

12   When did it stop being trust monies and start being government

13   monies?

14           MR. RUDERMAN:  I think the statute specifically tells

15   you.  It -- the minute it goes into the PBC's coffers.  The

16   corporation is authorized to pull assets of terminated plans --

17   plans, plural, for purpose of administration and investment,

18   payment of liabilities.  I'm going to skip ahead, and such

19   other purposes as it determines to be appropriate in the

20   administration of this title.  And the statute gives us those

21   rights.

22           THE COURT:  But all trustees of trusts, general

23   trusts, bankruptcy trusts, estate law trusts, trustees all get

24   to use trust monies for administration.  There's nothing

25   unusual about that.

1          MR. RUDERMAN:  Exactly.  But the point that's being

2    made is that they can use it for the administration of that

3    trust.  This says, that not only for that individual trust, it

4    says all such trusts so it's plural.  It's used twice, the

5    plural there.  And it further has this clause, and such other

6    purposes that it determines to be appropriate in the

7    administration of this title.  It doesn't say in the

8    administration of that plan.

9          THE COURT:  Any cases construing that clause that

10   tells you that the PBGC can do whatever it wants to with the

11   money?  Because I think that would be a shock to the plan

12   beneficiaries that if, you all are looking for what?  $110

13   million out of the California bankruptcy case?  If you had

14   gotten 110 million, I can't imagine that you wouldn't have

15   given the money back to the plan beneficiaries.

16         MR. RUDERMAN:  They're already getting their money.

17         THE COURT:  And but -- they're getting minimum

18   benefits.

19         MR. RUDERMAN:  No, no, no.  No, so we want to get

20   into the specifics actually of this case, because this actually

21   came up in the Central District Court of California.

22         We have a thing called guaranteed benefits and non-

23   guaranteed benefits.

24         THE COURT:  Right.

25         MR. RUDERMAN:  Guaranteed benefits generally pay up

1  to about -- I don't know the exact amount but about 65- to

2  $70,000 a year to participants of a plan based on the terms of

3  the agreement.  In this case, with over, I think, 3 or 5,000

4  participants?  I think there was well over 3,000.  I think

5  might be close to 5,000 participants.

6          THE COURT:  Right.

7          MR. RUDERMAN:  Guaranteed benefits were paid but for

8  seven individuals.  All -- 99 -- well over 99 percent of the

9  participants got paid every penny that they were originally

10  owed under the plan and the only people were seven highly

11  compensated individuals that had a small cutback in this case.

12          We're not talking about 99.9 percent.  We're talking

13  about the rare few, and that's where the government has

14  decided, in those circumstances, where the PBGC has had to come

15  out of pocket to pay benefits.  In this case, as I pointed out,

16  the losses were about $150 million to the agency.  So we were

17  losing $150 million and essentially everybody is getting paid

18  in full.  A few people -- I'm almost certain it was seven,

19  people are getting slightly less than that amount, and the PBGC

20  on the other hand is suffering $150 million in losses.

21          And I think the statute correctly recognizes that at

22  some point, there needs to be a cutoff to come to how much

23  money goes out to highly compensated individuals.  And so, I

24  don't think that would happen.  I think that everybody is just

25  appreciative of what a good job the PBGC does.

1           The PBGC steps in, for all these individuals that are

2    losing their pension and we provide a phenomenal government

3    function to enable them to continue to receive the benefits.

4    And we did that.  That's exactly what we did.

5           Five years ago, we started paying these benefits.

6    And nobody has not been receiving their pension obligations

7    because of what we did.  So I would just respectfully disagree,

8    Your Honor, that anybody would be complaining about the few --

9    maybe some participants but there's just a slightest of a

10   cutoff.

11          THE COURT:  Okay.  In the LTV case then --

12          MR. RUDERMAN:  Yes.

13          THE COURT:  -- the PBGC and I understand what was

14   going on there factually between the company and the PBGC and

15   the -- and these follow-on plans and all that sort of thing.

16   But the PBGC made the decision to reinstate the plan.

17          MR. RUDERMAN:  Correct.

18          THE COURT:  All right.  What did you use?

19          MR. RUDERMAN:  What?

20          THE COURT:  Was it trust money because of the

21   recoveries had been enough or that they -- are you telling me

22   that money had already changed over into the government money

23   and the government was refunding money the plan?

24          MR. RUDERMAN:  I'm not sure exactly how that worked,

25   but the plan was reinstated.

1           THE COURT:  Right.

2           MR. RUDERMAN:  So the sponsor of the <u>LTV</u> plan,

3  whoever continued to sponsor the plan, then became liable for

4  the obligations.

5           THE COURT:  Right.  But the PBGC had decided it

6  didn't like the follow-on plan -- and mind you, I'm not opposed

7  to the PBGC.  I recognize what you're saying about it.  It has

8  a terribly tough job given the circumstances and then folks

9  like to try to underfund their plans.  But it restored the

10  plan, finding that there were enough assets in the plan

11  basically to be solvent and to go forward.  So the money is

12  still in the plan.

13          MR. RUDERMAN:  I think that what the Court -- I think

14  what the PBGC did because you know, we have a handful of

15  experts -- they calculated out what would be owed to

16  participants under those circumstances.

17          THE COURT:  Right.

18          MR. RUDERMAN:  And determined that under those

19  circumstances, there would be sufficient funds with additional

20  funding by the sponsor.  Essentially what -- really what that

21  case, to my recollection and I -- I'm a little bit nervous that

22  I'm stepping beyond my current recollection.  But what that

23  case stood for was the fact that there was a plan sponsor out

24  there that could afford to make up the underfunding to ensure

25  that the obligations would get paid.  They had used some

1  ability to obtain a termination under circumstances where they

2  -- the -- where they otherwise could afford it.  So the extent

3  that benefits are underfunded moving forward, the company was

4  viable under those circumstances to use its own funds to make

5  up the underfunding.  In essence, our case it was $150 million

6  of underfunding that needed to be made up so the plan sponsor

7  would be making up those underfunding to ensure that

8  participants got their benefits paid in full.

9          THE COURT:  Yeah.  I'm looking at the case and what

10 happened was the steel industry started doing better.

11         MR. RUDERMAN:  Yeah.

12         THE COURT:  And the PBGC, motivated both by that fact

13 and the fact they didn't like this follow-on plan which was

14 considered to be abusive, and that sounds reasonable to me,

15 basically decided to restore the plan and then you get in a

16 fight with the company about whether it was going to be

17 restored or not.

18         But I'm just looking at -- mind you, my focus is,

19 when did it stop being trust funds and become the government

20 money?  That's my real question and I'm looking at this

21 termination can be undone under 1347, Title 29.  Let's see.

22 Take action as necessary to restore the plan to its

23 predetermination status including, but not limited to, the

24 transfer to the employer or plan administrator of control a

25 part or all the remaining assets now (indiscernible) the plan.

1  So when you terminate it there, the monies did not go to the

2  federal government.

3          MR. RUDERMAN:  See, one thing that I think that I'm

4  not clear on the facts of that case, and you know, if you would

5  like to -- I could attempt to get further.  But I'm not

6  convicted it's relevant but at least to address to your issue.

7  I don't know if the -- once the plan was terminated, the assets

8  were ever actually turned over to the PBGC.

9          THE COURT:  Okay.

10         MR. RUDERMAN:  So it -- you know, as I pointed out in

11  2016, this plan was terminated, and we ensured that ultimately

12  that benefits were paid immediately.

13         THE COURT:  But it wasn't mature.

14         MR. RUDERMAN:  But it wasn't until 2017 that we

15  actually paid the benefits.  So there may have been, and I

16  don't want to overly speculate, there may be a time period

17  where PBGC in dealing with this follow-on plan had made a

18  determination that the plan was terminated.  But there wasn't

19  an actual transfer of the assets over to the PBGC.  That may be

20  the case.  I don't know if they went back and recalculated what

21  -- how much money came over and then turned it back over,

22  subtracting the benefits that were paid out.  I really don't

23  know but I think that's just as likely a possibility.

24         THE COURT:  All right.

25         MR. RUDERMAN:  That the money was never actually

1  transferred away from whoever the custodian of the assets was

2  at the time.

3           THE COURT:  Okay.  Any other arguments?

4           MR. RUDERMAN:  Let me just try to summarize a little

5  bit.  I'm guessing there's going to be comments made by the

6  other side and I'll probably have an opportunity to be heard

7  hopefully.

8           THE COURT:  No, we're going to -- you're the only

9  game in town today so we're here --

10          MR. RUDERMAN:  But you know, I just think, to the two

11 major points that have been made, so far, I think, raised by

12 you, Your Honor, is that this is not a debt for contract.  This

13 is based upon a -- basically a fraud.  This is a prohibited

14 transaction under ERISA.

15          THE COURT:  Yeah, but at the beginning, there was a

16 contract.  And the contract was the plan, was there not?

17          MR. RUDERMAN:  What?

18          THE COURT:  In the beginning, Freedom set up a

19 qualified plan and offered basically participation to its

20 employees which they accepted by enrolling.  That's where I'm

21 saying, isn't there a contract at the root of this?

22          MR. RUDERMAN:  But I don't see that being any

23 different than what happened in the FDIC situation or in the

24 FTC situation.  The government agency took its controlling

25 statutes and determined there was some fraud going on.  I - you

1    know --

2          THE COURT:  Well, restitution is a named event that

3    makes it a debt of the United States.

4          MR. RUDERMAN:  Well, but here's the other point that

5    maybe I need to make to address this.  It's not clear to me

6    what contract you're referring to, because the contract that

7    existed that may be what we're talking about is the prohibited

8    transaction.  That was a transaction that occurred between the

9    pension plan and these individuals over here sitting on the

10   other side, that committed the fraud and ERISA specifically

11   says you can't do that.  You have a prohibited transaction.

12         So what I'm saying is I can't imagine that this

13   exception to the statute was written to preclude the PBGC or

14   any federal government agency to recover for damages caused by

15   transactions that are outlawed, that are not allowed under the

16   law.  So I would assume they would have to be based on an

17   actual contract that existed.

18         And our case, we're suing on a prohibited

19   transaction.  A contract, if you want to call it a contract,

20   but one that was -- occurred as a result of a fraud and is not

21   permitted under the law.  So I would suggest this is not a

22   contract case.  This is a restitution case for prohibited

23   transactions under ERISA and therefore, it squarely fits under

24   the statute as a claim for restitution or damages.

25         THE COURT:  You said we and I assume you mean the

1  Trustee with PBGC as having the bulk of the estate.  Is that

2  what you're saying?

3          MR. RUDERMAN:  Yeah, I don't -- I think it -- I don't

4  think it's relevant.

5          THE COURT:  If we mean PBGC, why wouldn't that the

6  issue?  I mean, claim preclusion, since you sued in California

7  on the same grounds?

8          MR. RUDERMAN:  And we got -- and then that was never

9  completed.  We moved here to the bankruptcy court.  We brought

10 this claim as an allowed claim against JTR on its bankruptcy

11 case, and then we entered in settlement that ultimately allowed

12 for those to be allowed claims.  So they are allowed claims

13 that arise out of the prohibited transaction.

14         THE COURT:  And now the Trustee wants to sue for more

15 prohibited transactions.

16         MR. RUDERMAN:  Well, no, he wants to take -- he --

17 what he wants to do is he wants to sue for fraudulent transfer,

18 because we sued JTR.  JTR is the debtor in this case.

19         THE COURT:  Right.

20         MR. RUDERMAN:  JTR took this money and paid out money

21 to all these people on the other side of the aisle and that

22 Trustee is asserting it's a fraudulent transfer because there

23 wasn't reasonably equivalent value given to JTR in return.  So

24 that's the next transaction.  That's, you know, that's your

25 typical bankruptcy garden-variety fraudulent transfer.  You

1    already have the claim.  Now, the government is exercising its

2    rights to collect under the FDCPA.  And it's taking an

3    underlying debt and seeking to use the fraudulent transfer

4    provisions under the FDCPA to allow it to reach back and grab

5    that money and bring it back into this estate.

6            THE COURT:  PBGC has been around since what, since

7    about 1990 or so?

8            MR. RUDERMAN:  Early '70s.

9            THE COURT:  '70s.  Okay.  In all that time, have you

10   ever brought -- FDCPA comes from the '90s, right?

11           MR. RUDERMAN:  I believe that's correct.

12           THE COURT:  1990?

13           MR. WHELEHAN:  1990.

14           THE COURT:  Has the PBGC ever used that statute in a

15   contested case and prevailed?

16           MR. RUDERMAN:  So, in -- to my -- we did some

17   research on this and to my knowledge, there are cases in which

18   allegations were raised of it but we have not any -- gone to a

19   final decision.

20           THE COURT:  And the courts adopted it.

21           MR. RUDERMAN:  And the Court's opinion.  But it's not

22   that anybody's contested it either.  Honestly, it's a situation

23   where I think, and I may be wrong, that people accept the fact

24   that we are entitled to proceed under the FDCPA and we've

25   resolved those cases.  I mean, we're always trying to settle

1  cases to prevent additional expenses.  Nobody has raised that

2  issue to us before.

3        THE COURT:  Either that or no one can afford to fight

4  the government.  It's -- again.  All right.  Anything else on

5  your end?

6        MR. RUDERMAN:  So like I said, I was going to quickly

7  summarize, but I think we got off a little bit.  I mean, I

8  think, in the first instance, that this is a claim that exists

9  as a debt owed to the United States under the statute and I

10  think it does apply here.

11        And then I think that there's a second point that has

12  been expressed multiple times.  These are funds that are going

13  to be recovered by the agency and in practice.  I mean, that's

14  what the purpose of the declaration showed, that the money goes

15  into the agency and is used and put into its general fund.  And

16  then ultimately the money potentially makes its way to the

17  revolving fund.  And you know, but it's commingled with

18  billions of dollars and numerous Trustee plans in the plural.

19        THE COURT:  I know that.

20        MR. RUDERMAN:  And then ultimately can be used for

21  the benefit of the agency's mission, and that's what the PBC is

22  there to -- is to provide for its mission and that's -- and

23  I'll leave it at that.  Thank you, Your Honor.

24        THE COURT:  I think we'll probably have another round

25  of this.  I was going to suggest a ten-minute break and then

1   get rebuttal arguments and let you go until we run out of

2   useful things to say.  So anyone feel opposed to that?  Why

3   don't we take ten minutes and come back?

4            MR. RUDERMAN:  Thank you, Your Honor.

5        (Recess taken at 10:55 a.m.)

6        (Proceedings resumed at 11:14 a.m.)

7            THE CLERK:  All rise.  Court is back in session.

8            THE COURT DEPUTY:  Have a seat everyone.

9            THE COURT:  Pretty warm in here.

10           Ready to hear from this side again.  Ms. Edwards?

11           MS. EDWARDS: Yes, Your Honor.  Thank you and thank

12   you for the break.  Just before I get started, I think I'll

13   pass up this Wilmington Shipping case.  I think what we're

14   trying to understand here, that we're trying to focus on is

15   what's the difference between the coffers, meaning I guess the

16   government's money, versus a trust, right?  So they keep citing

17   to cases that use this term "coffers" with the FTC and the

18   FDIC.  And I think the case law's pretty clear that there is a

19   big difference between coffers of the government, government

20   money, versus going into a trust and a plan.  And I think to

21   find anything otherwise is different than what the Fourth

22   Circuit has already found.

23           So in the Wilmington Shipping case, you know, to

24   answer some of the questions you asked, one of your things was

25   what's the original funding, you'll -- when you're talking

1  about the PBGC, what's your original funding?  And the Fourth

2  Circuit in this case on Page 4 says the cost of the PBGC

3  insurance is borne primarily by employers that maintain ongoing

4  pension plans.  So the pension plans are kind of what pays in.

5  And then more importantly, this case also then discusses the

6  distinction, and I think this is the distinction between

7  coffers and trust, is talked about here.

8          And again, in my original argument we went over that

9  in this case they are trustees.  And I think that has all the

10  fiduciary duties of a typical trust which you are alluding to:

11  Where did the money go; who do you represent; is the money

12  going back to the Trustee; or do you owe an obligation to the

13  beneficiaries of the trust?  And I think you're correct, and

14  the Fourth Circuit is correct.  The distinction between the

15  PBGC's guarantor Trustee roles is particularly important with

16  respect to the management of plan assets.

17          As Trustee, the PBGC must hold all plan assets

18  including assets recovered through litigation, which is what

19  this would be if it could use as the FDCPA in trust for the

20  plan.  So I mean, and it goes on, and you have it, and you can

21  read it.  But it's very clear that if the PBGC is Trustee, it

22  must act in accordance with the -- as a Trustee, such that it

23  goes to those beneficiaries.

24          And then you also asked at some point, you know, what

25  if -- this waterfall concept, right?  So what if there's more

1   money, and then they seem to conflate that that might go to the

2   PBGC.  And I don't believe that goes to, you know, bonuses for

3   the PBGC employees, or to the U.S. Treasury, or anything like

4   that.  And I think this case also then discusses that.  So if

5   it was overfunded, it says here, "Just as the PBGC may

6   terminate an insolvent plan under 1342(a), it may undo the

7   termination if it determines that the plan participants will

8   best be served by plan restoration."

9           So I think that the point of the Williams, sorry,

10  Wilmington Shipping case is that they already answered this

11  question, what can the PBGC do as Trustee?  Well, that's

12  something that I feel like as bankruptcy, you know, attorneys,

13  and judge, we actually do know.  We do know the obligations of

14  a Trustee and what those are, and who you're supposed to be

15  watching out for.  It's not to bring money into the coffers of

16  the government, the U.S. Treasury, anything like that.  It is

17  always for the plan beneficiaries, and that's who they are

18  working for.  And really, that's the only point.

19          I think this question, as far as what we're

20  granularly getting into, which is coffers versus trust, what

21  are we working towards here?  Is it money to the government, a

22  sovereign?  Or is it money to the trust and plan beneficiaries?

23  Here, they are Trustee, it is plan beneficiaries, and in that

24  role as Trustee this Fourth Circuit case answers what their

25  rights are in litigation.

1            THE COURT:  Okay.  Ms. Westbrook, anything?

2            MS. WESTBROOOK:  Your Honor, I would just say that I

3    just keep going back to the big picture.  You know, how did

4    this claim originate, why are they here, what capacity are they

5    suing in?  And I think that just answers all of our questions.

6            THE COURT:  Okay.

7            UNIDENTIFIED:  Your Honor, again, just echoing my

8    colleagues.  It seems like what I haven't heard is some

9    demonstrable authority to say that the recoveries from these

10   actions could go to pay interest on the national debt, or part

11   of President Biden's Inflation Reduction Act programs.  I mean,

12   if it were something where the monies were that general, then I

13   think we might be within the definition of debt for purposes of

14   the Act.  But it doesn't seem like I've heard that.

15            And what I've heard is that the PBGC's a corporation,

16   no one disputes that, that it falls within that definitional

17   statute.  I think I heard a lot about the Central District

18   litigation where the PBGC was asserting direct claims, or sort

19   of independent claims, for wrongdoing as if that somehow would

20   make them not have the role that they have under the complaint

21   that they sued under, Trustee.  And I think the question is,

22   notwithstanding those claims, what use are the proceeds that

23   may be recovered on those claims put to?  And, again, if it's

24   to pay the interest on the national debt or, you know, other

25   program, then I think that's one answer.  But I just don't

1    think there's any demonstration that that's the case.  It is to

2    stay within the four walls of the PBGC and the purposes to

3    which it is intended to do.

4              THE COURT:  Okay.  Mr. Grier, anything?

5              MR. GRIER:  I would only point out, making a very,

6    very minor point, Your Honor, the description of the California

7    actions.  Those allege a prohibited transaction.  They do not

8    allege fraud, where fraud is not contained in the California

9    actions.  And I think that's the minor point, but just wanted

10   to bring that --

11             THE COURT:  Wasn't there something about the letter

12   agreements or something, that that was a fraudulent conveyance?

13             MR. GRIER:  Fraudulent conveyance, yes.

14             THE COURT:  By --

15             MR. GRIER:  But actual fraud, no.

16             THE COURT:  A constructive fraudulent -- yeah.

17             MR. GRIER:  A constructive fraud, yes.

18             THE COURT:  Mm-hmm. Okay.  Thank you.

19             All right.  This side?  Who wants to go first?

20             Mr. Ruderman.

21             MR. RUDERMAN:  So, I apologize if I used the terms

22   loosely with regards to fraud.  I think the prohibited

23   transaction's under us, and I just -- as I said earlier, I

24   can't believe that this statute was set forth to allow that the

25   government -- or preclude the government recovering money that

1  it otherwise has already said is based upon a prohibited

2  transaction.  To me, that just doesn't make logical sense.

3          But on that same point, I think that the FTC case

4  makes a very critical distinction that I think applies to this

5  case.  And as you may recall earlier, I don't think Sobranes

6  was incorrectly decided.  I think there's a critical

7  distinction that exists that puts us on the side of the FTC

8  case that's different than if -- let me see if I said this.

9  There's a critical distinction that puts us more like the FTC

10 case and not like the Sobranes case.  And that's the point I

11 want to make.  And I'm going to read this sentence to you.  The

12 critical distinction between this case and National Business

13 Consultants, that's the FTC case.  Oh, I'm sorry, FDIC case.

14 Oh, let me slow down, because the Sobranes case, that was the

15 FDIC.  But it dealt with a contract between private parties,

16 and I'm not disputing that.

17         The critical distinction between this case and

18 National Business Consultants is the FDIC was seeking only to

19 recover under the terms of the contract originally entered into

20 by private parties.  Whereas, as in NBC, the FDIC was

21 vindicating in its independent statutory authority to enforce

22 the FTCA.  This is PBGC's seeking to vindicate its independent

23 authority to enforce ERISA.  That is, the judgment the FTC

24 recovered was not owing under the terms of a contract between

25 private parties,  even if the private contracts provided the

1  impetus for the lawsuit.  And I think that's the critical

2  distinction, that the Court made in Sobranes that sent the case

3  in one direction that I think sends the case in the opposite

4  direction in our case, just like the FTIC case.

5           Even if there was an underlying contract that was

6  legal, it doesn't matter.  It's the fact that the government is

7  seeking to vindicate its independent statutory authority to

8  enforce the ERISA.

9           Okay.  And another point that was just addressed by

10 them is there seems to be a lot of attention to some languages

11 in cases that talk about the money going into the Treasury.

12 And I think it's been written in almost brief I've read in this

13 case, maybe not all of them, that the first place you look is

14 the plain meaning of the statute.  And the plain meaning of the

15 statute does not define the government as the Treasury.  The

16 plain meaning of the statute defines it to include federal

17 corporations.

18           So this concept that the money must actually go into

19 the Treasury rather than have to go into the government is, to

20 me, is just the wrong distinction that needs to be made.  The

21 only limiting factor that's in the plain meaning of the statute

22 as to whether it goes to the government is whether it's based

23 on a contract between private parties.  And I think I just

24 addressed that issue.  So we really should not be looking as to

25 whether or not this is going into the overall Treasury.

1          And I point out this, I've also mentioned multiple

2    times several cases where the Court ruled that the FDIC could

3    proceed under the FDCPA.  To me, I don't know how you square

4    those cases under this scenario if we say the money has to go

5    into the Treasury.  Because the FDIC is who PBGC's modeled

6    after.  They are funded by the premiums that are paid by the

7    member banks.  They're not receiving directly from the

8    Treasury, and when it recovers money, it doesn't just go ahead

9    and say here, U.S. Treasury, here's the money we recovered.  It

10   goes into the coffers of the FDIC, a federal government

11   corporation which is defined under the statute, as is

12   government.  And I think those are very important points to

13   make.

14          The last point I --

15          THE COURT:  So the inquiry ends when it's the PBGC is

16   a government corporation, therefore is the U.S.  Well, I have a

17   definition of debt.  There is a definition of debt under the

18   FDCPA.

19          MR. RUDERMAN:  Yeah, it's defined.

20          THE COURT:  You're writing out the whole definition,

21   are you not?

22          MR. RUDERMAN:  No.

23          THE COURT:  You're simply saying end of ballgame

24   because we are the government, therefore there's a debt owed to

25   the government.

1           MR. RUDERMAN:  No.  We have to show that this was

2   restitution.  This was a claim for restitution, or this was a

3   claim for damages.  And we also have to show that it's not

4   based on a contract with private parties.  That's what the

5   statute is saying.  And, yes, if PBGC -- I'm trying to think of

6   a scenario off the top of my head.  But if PBGC --

7           THE COURT:  Let me ask a scenario, just while we're

8   doing this.  What if you had appointed an independent Trustee?

9   Is it still the PBGC's money, or is it in trust?

10          MR. RUDERMAN:  Okay.  There has never been a case

11  that I'm aware of in which an independent Trustee's appointed.

12  When a Trustee to client --

13          THE COURT:  But the statute allows it.

14          MR. RUDERMAN:  But the statute allows it.

15          THE COURT:  Mm-hmm.

16          MR. RUDERMAN:  I think at that point because they

17  cannot take benefit of 4042, which gives us the authority that

18  once we take in the plans we can pool it with the other assets

19  of the other plans, and gives us a right to use it not only to

20  pay benefits, but to use it for any other purpose -- and such

21  other purposes that it determines it to be appropriate in

22  administration of this title.  I think that's the difference

23  between an independent Trustee and the PBGC.  PBGC actually

24  has, from the plain language of the statute, statutory

25  authority to do what it does.  And it does do that.  I mean,

1   it's actually -- we have declarations from people at the PBGC

2   that tells you exactly that's what we do.

3          THE COURT:  It says which the PBGC determines, and

4   that sounds like an affirmative action.  Is there some process

5   by which they determine to use the money for other things?

6          MR. RUDERMAN:  Well, as I pointed out, I think the

7   structure of our trust have been created over years and years

8   of the PBGC's being into existence.  And they have determined,

9   in its mind, that the appropriate way to administer all these

10  things, because we're talking about, you know, and then you

11  mention to all the plans --

12         THE COURT:  Sure.

13         MR. RUDERMAN:  -- that the appropriate way to

14  administer these plans and also pay for the government is to

15  set up this structure that provides that funds go into our

16  general trust fund, it's commingled with all the trust funds.

17  And then we also have what we call the revolving funds, and

18  those revolving funds are the actual funds.

19         And let me just make a distinction.  There's a reason

20  why you have the revolving funds, and you have the trust funds.

21  The trust funds invest the money in certain manner, and thus

22  the money that's sitting in the trust fund, it's like money

23  that you use on an everyday basis versus money that you're

24  saving for college.  We have to pay these benefits out for, you

25  know, arguably 50 to 100.  You know, some of these

1  beneficiaries are the children of workers that may be living

2  for years and years.

3          So we initially put the money into the trust fund,

4  and we invest those funds in a certain manner.  At some point,

5  we decide we need to use that money to pay our bills, and those

6  bills include paying participants their benefits in our role as

7  a guarantor.  And it also includes the administration of the

8  entity as a whole.

9          So we're taking the money out of the trust fund, and

10  then we move it into the revolving fund, and then ultimately

11  the revolving fund then pays out just like I would have a bank

12  account that would be separate and aside from my general long-

13  term investments.

14          THE COURT:  Is there somewhere in either the

15  Trustee's complaint or your proof of claim, which was

16  referenced by the complaint, that talks about the monies are

17  now in the revolving funds?

18          MR. RUDERMAN:  Well, I have no idea.  They're all

19  commingled.  I mean, they lose their character.  I mean, they

20  lose their character.  The minute they go into the trust fund

21  you're talking about billions and billions of dollars.  You

22  know, we're not -- that's why the statute lets us do this.

23  It's giving us the opportunity to invest it as one big fund

24  instead of trying to independently invest it.  And that

25  wouldn't be good for the smaller plans.  Smaller plans would

1    not benefit without the economics of scale.

2         THE COURT:  Never mind with that.  I'm limited on a

3    12(b)(6) to the complaint and what's in the attachments to the

4    complaint, which is your proof of claim.  And I've pored

5    through those, and everything I'm seeing says PBGC holding in

6    trust for the plan, or the benefit of the beneficiaries of the

7    plan, effectively.  I'm not seeing anything in there that says

8    this money is the PBGC's property and is in the revolving funds

9    and is being used elsewhere.  So what I'm trying to get is some

10   help here factually to try to resolve this 12(b)(6) is where

11   does the PBGC and the Trustee say that this money belongs to

12   the PBGC as opposed to the trust?

13        MR. RUDERMAN:  I think the distinction I'm making --

14   and I hear you.  I don't know whether that's in the complaint

15   or not, and maybe that's a reason to amend the complaint, to

16   allow the parties to amend the complaint.

17        But what distinction that I'm making is that the

18   statute doesn't require us showing, it only requires it showing

19   that it needs to be owed to the government, and these are

20   monies that are owed to the government.  We've already paid

21   them out.  We've been paying benefits -- I mean we're still

22   paying benefits, but we've been paying benefits five years.

23   PBGC has stepped in and paid those benefits.  And if we recover

24   money, in theory, along with helping to pay future benefits,

25   it's also reimbursing us for the money that we've already been

1  paying out.  So the concept is, it's going to the government,

2  and it's based on the claim that we're entitled to under the

3  statute.  I don't see where it requires us to show that it's

4  anything, but money owed to the government, and that's the

5  plain meaning of the statute.

6          THE COURT:  Okay.  Anything else?  We done?

7          UNIDENTIFIED:  May I just -- one moment, Your Honor.

8          THE COURT:  Please.

9          UNIDENTIFIED:  Let me say first and foremost that the

10  Trustee, you know, adopts the positions that the PBGC has

11  articulated.  This is a very nit-picky correction, but I want

12  to make sure it didn't cause confusion.  I think the quote that

13  you heard a moment ago regarding the distinction between

14  Sobranes and National Business Consultants may have confused

15  some of the alphabets we've been talking about, may have just

16  misstated that.  So let me give you this citation.  And it is

17  Sobranes at Page 226, and that obviously correctly identifies

18  the parties in those various cases.

19          And I also wanted to address the point you just

20  raised, Your Honor, which is where is this statement of

21  ownership in the complaint.  And what I would submit to you is

22  I think it was not apparent at the time of filing that that was

23  a necessary allegation, right?  I mean, this wasn't an issue

24  that came up during the course of argument.  We certainly

25  didn't foresee the materiality of that claim.  So to the extent

1  that we're looking for inadvertent, excusable neglect, I would

2  proffer perhaps that omission as excusable neglect on my part

3  in drafting the complaint.

4        THE COURT:  Well, if so, I think it's one that the

5  PBGC repeated before you, because the California complaints

6  talk about being in trust.  So, all right.  Let me ask some

7  questions then.  And they're practical questions, for this side

8  of the room.

9        You've got a win; I haven't been moved from my

10  position.  Frankly, and I can tell you what I think about all

11  this.  I had Wilmington Shipping in front of me when I've wrote

12  this.  And I didn't feel the need to cite it because I thought

13  the concepts were so clear and uncontroversial that there was

14  no need to it.  They were basically referring to statues, which

15  you can see.  But that last point, we've got real people

16  litigating this, and I'm of course always concerned about the

17  cost of the exercise.  We've been around maybe four different

18  times now, and we're not even past the 12(b)(6) stage, at least

19  in my arguing about it.

20        From this side of the room, you're going to have to

21  file an appeal, and maybe up to the Circuit level potentially.

22  And the question is, do you want to do that given that there

23  may be this argument about, well, we didn't amend to -- we need

24  to amend to talk about why the PBGC is owed the money as

25  opposed to the trust.

1          I'm content to leave it right as it is today.  And

2  I'll just tell everyone that on the front end.  I've spent a

3  lot of time on this, and I've thought about it a lot.  And I

4  just think two things.  One is the money doesn't go to the

5  Treasury, and I do think that's important.  I think that's the

6  inquiry because the purpose of the FDCPA was to prevent

7  burgeoning federal deficits and was to allow the government not

8  to have to rely on state law, but to be able to recover sums

9  owing to the government.  And so I think the entire purpose of

10  the FDCPA hinges upon whether the money inures to the

11  government as opposed to the trust, or whatever.

12          But the question is do you want to go up on that and

13  potentially face a reversal on the fact that there might be

14  a -- that if this complaint doesn't state a claim, that there

15  might be another one that could be alleged, or would you rather

16  get that resolved now by allowing an amendment?  I haven't

17  changed my mind.  And then another round of whether or not the

18  PBGC has something here that is either a debt owing to the

19  government, or damages, or whatever it is.  Because it's not in

20  the proof of claim, and it's not in the complaint right now.

21          UNIDENTIFIED:  Your Honor, I think we safely feel

22  ready to go up.  Yeah, I think it will cost more to go around

23  and around otherwise.

24          THE COURT:  Okay.  Well, I'm going to elaborate a

25  little bit because I don't think my earlier ruling says all the

1    things that we've argued today.

2            First thing, intervention.  I appreciate the PBGC

3    being here.  I think I've profited if no one else, from their

4    input, and they had requested the right to be heard today.

5    Just as an amicus would be allowed to file a brief, I've

6    allowed that, and I think that's fine.

7            I don't think the PBGC is allowed to intervene in the

8    action under Rule 24.  This is a Chapter 7 case, or cases.  And

9    everyone knows the rules on Chapter 7.  Effectively to allow

10   the intervention by third parties, it's jealously guarded in

11   the Chapter 7 context because the Trustee speaks on behalf of

12   the bankruptcy estate.  And because resources are limited, and

13   you don't want to be disposing of the resources of the estate

14   where you have multiple parties making contentions in court and

15   on appeal, there's got to be one person driving the bus.  And I

16   believe in the 7 context, that is the Chapter 7 Trustee.  In

17   any events, the grounds are not established under Rule 24, for

18   the reasons argued.

19           The second part:  is there reconsideration.  I'm

20   going to reconsider it only to the extent to make some more

21   observations that may not be found in the original opinion.  I

22   don't know that we need to amend the opinion because I still

23   think it was my best take on it anyway.  It's an interesting

24   question.  I'll be interested to see what a higher court thinks

25   about it.

1        But I did want to say a couple of other things about it.

2   I don't really think the Rule 9024 criteria are met for the

3   reasons argued.  But at the same time, they gave me some other

4   things that I at least recognize that there might be some

5   ambiguity, intentional or otherwise, as to what I'd said

6   earlier.  So I want to just make a couple clarifications as to

7   where we are.

8        First of all, while the Trustee and the PBGC seem to

9   think otherwise, my ruling was entirely based on the complaint,

10  the PBGC's proof of claim which was incorporated into the

11  complaint, the ERISA statutes and the caselaw, particularly the

12  Fourth Circuit caselaw.  And as I said, I had Wilmington

13  Shipping in with me when I was reading this and made the

14  mistake of thinking that the statements there were so clearcut

15  that there needed not be further citation.  But that's my

16  fault.

17       As to the arguments that have been made, as to there

18  was a nit in the motion to reconsider that I found the PBGC is

19  funded through premiums paid by plan sponsors, and not by the

20  U.S. Treasury, and the argument was, well, yeah, but there are

21  also assets to terminated pension plans, returns on the assets,

22  recovery of statutory liabilities, and recoveries on causes of

23  action.  That's certainly true.  I was speaking shorthand

24  because the point was that, and I don't think anyone's argued

25  it, PBGC isn't funded through the Treasury.  It's funded

1  through third-party sources, and what I called basically

2  insurance premiums is broader than that.  So just for that

3  clarification.

4         There's an argument that has been made that the Court

5  was finding that the question was whether the funds would be

6  retained to the U.S. Government or delivered to a third party.

7  And that as a result I had found that this was not an instance

8  of the U.S. guaranteeing benefits to the Freedom Plan

9  beneficiaries but guaranteeing benefits using funds provided by

10 third parties.  That's true and false.  I think it

11 mischaracterizes the rulings.

12        I realize the PBGC guarantees a minimum of amount of

13 benefits as an insurer, and I didn't hold to the contrary.  But

14 the PBGC pays those beneficiaries through coffers that are

15 funded by plan insurance premiums and recoveries, not from

16 monies deriving directly from the U.S. Government.  And the

17 caselaw I've relied on basically said which groups cover that

18 scenario, and we've argued about them at length.

19        The argument that has been made is the PBGC, not the

20 plan, holds a direct financial stake in the collection of this

21 claim, and that while the Court found the PBGC was collecting

22 its debt may promote the interests of the beneficiaries, the

23 debt will not inure to the U.S. Treasury.  I think as pled, the

24 debt is alleged to be owed to the plan, and the PBGC is alleged

25 to be the Trustee for that plan and being a trust the

1  beneficial interest lies with the beneficiaries, not with the

2  PBGC.

3          The argument is made the Court doesn't understand the

4  PBGC's operations.  Well, that's probably true.  It says I am

5  mistaking the understanding of their operations.  I have very

6  little understanding of their operations.  Bottom line is I

7  don't think they're relevant.  The ruling construed the

8  complaint, the claim, the statutes, and the caselaw.  And I

9  can't use affidavits or factual averments that are outside of

10 those bounds, so I have no idea what the corporation does

11 internally, and don't think it's applicable.

12          There was a nit about whether or not the parties

13 raised the financial stake as an argument for the motion to

14 dismiss.  Well, I think it sort of was.  But one, the Court's

15 not a potted plant.  I get to weigh in too.  You're arguing

16 whether -- about whether the Trustee could step into the shoes

17 of the PBGC to use the Federal Debt Collection Procedures Act.

18 So I get to construe the whole statute there.  And in the

19 second part, we've had that argument today.  So I think that

20 takes care of it.

21          Let's see.  Any further recoveries made by the PBGC

22 would have no effect on the participants' beneficiary benefit

23 calculation.  That assumes facts not found in the complaint or

24 claim.  It mixes the insurer duties with being a Trustee.  And

25 my question again is what if the PBGC recovered the whole 110-

1   or $150 million of the plan?  Would it keep the money for

2   itself and stiff the beneficiaries?  And I think the answer

3   anyone would say is no.  It likely would reinstate the plan,

4   but I can't find that, based on as a matter of law.  But even

5   what was said today was those beneficiaries would get some

6   money out of it.  So I think there's still a trust relationship

7   there, and that's what our Circuit has found.  That even after

8   it's paid in, it's still in trust, notwithstanding commingling.

9        Let's see, what else.  We've touched on most of

10  these.  There was an assertion that the Court was suggesting

11  that the key question is whether the United States would keep

12  the money recovered in the collection action, citing Beatty

13  (phonetic).  I don't think that's the question.  I think the

14  question is who is the money owed to, and what does it meet

15  with the definition of debt owed to the United States under the

16  statute.  And as I would say is, the answer to that is no.

17        The logic of the Beatty, Borgiono (phonetic),

18  Nifadson (phonetic), and Rostoff (phonetic) cases would require

19  a determination that the PBGC claims are a debt owing to the

20  United States, that was the argument.  Well, by and large,

21  those were criminal restitution cases where the restitution was

22  owed to the United States, not to individual victims.  It was

23  not restitution owed to victims.  And restitution that's owing

24  entirely to the government is provided for in the definition of

25  debt owing the United States, and the other kind is not, and

1   the caselaw excludes it from that.

2          So the trust recoveries under Part 4 of ERISA are not

3   expressly provided for in the statute, in my mind, and they

4   don't fit the definition.  I don't know of any case that says

5   that where the government is acting as a Trustee, as it is

6   here, that the Federal Debt Collection Procedures Act has ever

7   been successfully used, at least not to the point of verdict.

8          So bottom line is I think a trust is a trust is a

9   trust.  A trust has a Trustee who has legal title and a corpus,

10  and it has beneficiaries who had the beneficial interest, and

11  that's, in my mind, the participants.

12         So we had the National Business Consultants case that

13  the Trustee was arguing on behalf of here with the FDC.  And as

14  I pointed out earlier, the FDC isn't a Trustee, there's no

15  trust.  It's a federal government agency funded in the budget.

16  None of the money goes to the FDC, it goes to the Treasury.

17  And moreover, there's no trust there.  Factually, as pled, the

18  trust complaint and the statement of support to the proof of

19  claim say nothing about monies being owed to the PBGC or the

20  United States in an individual capacity.  It's all about it

21  being owed to the trust.

22         As I've said before, I don't think you can simply

23  conflate United States with the PBGC being a corporation with

24  that meaning anything owed it is a debt within the meaning of

25  the statute.  Otherwise, you write the definition of debt out.

1   And if that were the case, then those restitution cases that

2   say restitution that's collected by the government for the

3   behalf of an individual would also be a debt owing to the

4   United States, and they would be wrongfully decided.  So

5   respecting those decisions, I have to draw a distinction

6   between restitution owing to the government and restitution

7   owing where the beneficial interest is otherwise.  And I've

8   said, in a trust the beneficial interest is otherwise.

9         And I've told you before that I think the purpose of

10  the statute is such that it matters whether the government's

11  getting the money back.  That effectively the purpose of the

12  FDCPA is to affect adverse effects, delinquent debts, and the

13  massive federal budget deficit now undermining the economic

14  wellbeing of the nation, that comes from the House reports.

15  They could have said anything owed to the United States would

16  then qualify, but they didn't.  Congress instead adopted a

17  definition.

18        And then there's the Fourth Circuit precedent there,

19  which I think agrees with the conclusion that there's no debt

20  owed to the PBGC with the meaning of this statute of Wilmington

21  Shipping says that when the PBGC is a statutory Trustee over a

22  terminated plan it has two hats:  One is guarantor, and one is

23  Trustee.  The LTV case says the cost of PBGC insurance is borne

24  primarily by employers that maintain the pension plan.  The

25  insurance is financed primarily by employers, and secondarily

1   by statutory liability.  And then, finally, as Trustee of a

2   terminated plan, PBGC has the power to commence prosecute,

3   defend, on behalf of any plan. And as Trustee of a terminated

4   plan, its empowered to collect amounts due the plan.  As

5   Trustee, the PBGC must hold plan assets including assets

6   recovered in litigation in trust for the plan.  That's all

7   Fourth Circuit law there construing the statutes.

8         At the end of the day, I think this is acting, just

9   as Mr. Shuford is here, entitled to try to recover these monies

10  in name.  He is doing so as the Trustee of a bankruptcy estate

11  where beneficial interests are held by the creditor body, and

12  not by himself.  It's not his money.  I don't think he can be

13  simultaneously the Trustee for the trust and claim to own the

14  beneficial interest in the money.

15        So I'm sorry.  I think it'll be an interesting

16  appeal.  I would simply say, for the benefit of any reviewing

17  court, you may assume that those are supplemental holdings.  I

18  don't think we need to try to put them all in a further order

19  because they're basically what the first order said.  So got

20  it?  All right.  We'll recess then.  Thank you all.  I've

21  enjoyed the discussion.  It was certainly interesting.  Nice to

22  get something new, and good luck.

23        UNIDENTIFIED:  Thank you, Your Honor.

24        THE COURT:  Well, I was glad to help.

25      (Proceedings concluded at 11:51 a.m.)

# C E R T I F I C A T I O N

I, Lisa Luciano, court-approved transcriber, hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, to the best of my ability.

_____

LISA LUCIANO, AAERT NO.  327          DATE:  September 30, 2022
ACCESS TRANSCRIPTS, LLC